## STATE v. JONES.

1. The prisoner demanded an examination of a juror, when presented, on his *voir dire.* The State objected, the objection was sustained, the juror was challenged by the prisoner and then the State waived its objection, and the juror was then examined and again challenged. *Held,* that the prisoner was deprived of no legal right.

2. The testimony of a witness at the trial in a murder case, may (the proper foundation being laid) be contradicted by his testimony at the inquest; and proof by the coroner of the testimony then taken down in writing by himself, although not otherwise remembered, or the testimony itself signed by the witness, is competent evidence for such purpose.

3. A coroner, in a proper case, testifying wholly from memory as to what was said by a witness at the inquest, is not confined to a statement of the exact language used, but it is sufficient if he repeats substantially the testimony of the witness.

4. Where the general character of a witness for the defence is directly assailed by the plaintiff in his reply, the defendant has a right to produce further testimony in support of the character so assailed.

5. An alleged occurrence in the court below, noted by the stenographer at the private request of counsel, but not of this officer's own knowledge, is not a fact in the case legally known to this court.

6. In the absence of the prisoner, the jury, after they had retired, were called in from their room, and asked if they desired further instructions. They replied in the negative, and then again retired. *Held,* that the law did not require the presence of the prisoner at that time, for this was not a part of the trial.

7. Before the argument commenced, counsel were informed that they would be limited to the time allowed by law—four hours to each side, and they were so limited. *Held,* that in this there was no error.

8. In saying to the jury that the attorneys on either side are not supposed to be impartial, and that the jury are to take their statements, both on the law and facts, guardedly; and further, that if the court mistook the law, it could be corrected—the trial judge committed no error.

9. Error was assigned to the trial judge in charging "that a juror can neither consider any fact which comes within his personal knowledge, nor can he communicate it to the other jurors without being in contempt of the court and violating his solemn oath." because, it was alleged, he thereby excluded from the consideration of the jury their personal knowledge of the witnesses. But as the whole context showed that the remark of the judge applied only to some fact alleged

to be known to one of the jurors, the exception is not well taken, and the instruction, so applied, was correct.

10. It appeared that there had been a dispute between prisoner and deceased as to the possession of a tract of land, but defendant testified that while on his way home he was violently attacked by deceased, and he then killed deceased. *Held,* that the judge did not err in instructing the jury that if this was so, the possession of the land could have no influence in determining the verdict.

11. In calling the place where the prisoner had killed three men on the same day, "the field of blood," the judge did not charge on the facts, for a field of blood it was, whatever the character of the homicide may have been.

12. The law presumes malice from the mere fact of intentional killing, but when all the attendant facts are shown, there is no room for presumption, and the State must prove the malice from the facts—and prove it, like other facts, beyond reasonable doubt, and not merely by the preponderance of the evidence.

13. The judge charged: "Homicide in self-defence is where one who hath no other *possible* means of preserving him from death or great bodily harm by one who combats with him on a sudden quarrel, kills the person who reduces him to such *inevitable* necessity." *Held,* that in this there was error, for it required more of the defendant than the law requires. In other particulars, the judge correctly charged the law of self-defence.

14. For the errors of law indicated in the opinion, a new trial was granted. Only the result[1] concurred in.

---

[1] What points in this case are adjudicated, only the result having been concurred in? In *Danks* v. *Quackenbush* (1 N. Y., 131), the judgment of the court below having been affirmed by an equally divided court, it was held as to this case, in *Morse* v. *Geold* (11 N. Y., 285), that "as the judges were equally divided in opinion, the determination cannot be considered as a precedent, but the question must be regarded as entirely open," and the same ruling was made in *People* v. *Mayor*, 25 Wend., 256. And to same effect is *Etting* v. *Bank of United States*, 11 Wheat., 78. In *McLure* v. *Melton* (24 S. C.; 567), Mr. Justice McIver, in commenting on a former case in which only the result was concurred in, says: "It will be observed that the majority of the court concurred only in the result, and hence that case can only be regarded as authority on the precise question therein adjudged, as presented under the special circumstances therein stated."

To what extent this court has regarded as authority prior adjudications in which only the result was concurred in, see the citations of *Graveley* v. *Graveley*, in 22 S. C., 540, and 23 S. C., 49 and 55; *Herndon* v. *Moore*, in 19 S. C., 334, 23 S. C., 68, and 25 S. C., 280; *Darby & Co.* v. *Shannon*, in 24 S. C., 404; and *Bonham* v. *Bishop*, in 27 S. C., 162.

In the principal case, it will be observed. that the result is not simply a

Before NORTON, J., Edgefield, March, 1887.

The defendant, Robert T. Jones, was indicted for the murder of a father and two sons on the same day, and was put upon his trial for the murder of the father, Charles Pressley, sr.   The Circuit Judge charged the jury as follows :

Gentlemen of the Jury : You have been appealed to by the State's counsel and by the counsel for the defence in regard to the discharge of your duty.   Perhaps the views of the counsel were conflicting to you, and may have put you in some error on the question, so I will say something to you about that.   You and I sit here for the trial of this cause.   You are the triers of the fact, which you get from the evidence, as applicable to the law as I give it to you.   The proper division of these duties is important to the ends of justice.   You are impartial men of sense, chosen from the vicinity.   You know the witnesses.   I am presumed to know the law, which is considered stable and applicable to a similar state of facts wherever found, and if I mistake it, I may be corrected.   If, coming to a right conclusion upon the facts, you should mistake the law, your erroneous judgment could not be corrected.   We are impartial.   Attorneys for either side are not supposed to be so, and we are to take their statements, both on the law and the facts, guardedly.   We are to investigate, respectively, the law and the facts for ourselves.   Bear in mind the evidence which has been excluded, and give it no weight in coming to your conclusion.   If counsel has inadvertently stated such to you, you will give it no weight.   Counsel has very properly said that it is your memory of the facts, not mine, nor his, nor the State's attorney, which is to govern you.

You are not to take the law from counsel, nor his books ; books are sometimes misleading, and the whole of the case is not brought to your attention, and you are not presumed to be able

reversal of the judgment below and a new trial granted, but a reversal of the judgment for the *errors* indicated in the opinion.   It would seem, therefore, that so far as errors are declared to the court below, there is a concurrence of the three justices, but as to matters complained of, but held not to be error, the two concurring justices have not indicated their opinion.

[REPORTER.

to have sufficient knowledge of the law to bring up the cases which are not read before you. One side claims that the same case means one thing, the other side claims that it means another thing; hence the necessity of an impartial interpreter who has made the law his study.

You are appealed to as an angel of mercy to save the defendant; you are appealed to to resent the persecution of the defendant, but none of these things ought to move you. You are not a mob to be influenced by passion; you are not to do anything but to find the facts, from the evidence, fairly, impartially, and without prejudice, let the result be what it may. You must speak truly, according to the evidence, and according to the classical derivation of the technical name of the formal announcement of that finding, and without regard to yourselves. I should feel insulted if I were asked to find the law out of sympathy; but, because insulted, I would, nevertheless, find the law in favor of the party who insulted me, if it were truly in his favor. So, no matter whether you like what has been said to you by the one side or the other, you will find the facts as they come from the evidence fairly, impartially, and without prejudice.

It is an unpleasant duty to sit upon a jury in any case, at any time. and pass upon the rights of parties, where there is a contention; it is much more unpleasant where much is at stake, especially when one of the parties litigant suspects the jury of such bias that he cannot fairly try the case; and, doubtless, one of the jurors in this action feels greatly embarrassed by the position he occupies, without fault on his part, and I therefore desire to say, for his comfort, that the surest way to enjoy a clear conscience and the well done of his fellows is to discharge his duty fearlessly and impartially, as he professed his ability to do, and has by a solemn oath sworn to do. That duty is to find the facts from the evidence adduced on the stand. The prisoner, by selecting him as a juror, has waived the benefit of anything to which the juror might have been able to testify, no matter how essential to the making out of his defence. The juror can neither consider any fact which comes within his personal knowledge, nor can he communicate it to the other jurors without being in contempt of the court and violating his solemn oath; and the

other jurors could not innocently listen to such statements—they would be unsworn to and unworthy of belief.

Murder is the killing of any person with malice aforethought, either express or implied. Manslaughter is the unlawful killing of another, without malice express or implied. Homicide, in self-defence, is where one who hath no other possible means of preserving him from death or great bodily harm by one who combats with him, on a sudden quarrel, kills the person who reduces him to such inevitable necessity. These general definitions will be borne in mind as you shall consider them more in detail in connection with the evidence.

Much time has been consumed and much expense incurred in establishing the relative status of the rights of defendant to the possession of the land where the homicide is said to have occurred. If you believe from the testimony that the defendant and Charles Pressley purchased the land jointly from the Sinking Fund Commission; that, after certain payments were made, Charles Pressley, in the presence and with the assent of defendant, rescinded the bargain of purchase and rented the land, (defendant is estopped from denying his presence and assent to such arrangement if he witnessed the paper, which Capt. Brooks testified that he did, and at the time of such witnessing knew what was being done), then the law applicable to such facts is that defendant had lost all rights under said purchase. Defendant testifies that in consideration that he had paid $200 towards the before mentioned purchase of the land, Charles Pressley agreed to rent the whole of the land included in said purchase, and to give to defendant a certain portion thereof, including the field of blood, rent free, so long as he, Charles Pressley, could hold it; that under this agreement he, the defendant, had been in possession of the land for over two years; that on Monday before the killing took place he first heard that Charles Pressley intended to revoke the parol tenancy.

If you believe this statement, then the agreement constituted a tenancy at will, and under the decision in *Godard* v. *Railroad Company* (2 Rich., 346), that more than two years having elapsed since its creation, it became a tenancy from year to year, and that defendant was entitled to three months' notice to quit, unless

Charles Pressley, by reason of having no title, except as he procured it annually, was unable to create any title except what he had at the time of the contract of letting to defendant, and even then, I should say that defendant had the right to retain possession under the agreement, at least until he had reasonable notice to quit, which ought to be longer than from Monday to Wednesday. I charge you, therefore, if you adopt that statement of facts, that the Pressleys were trespassers on the possession of defendant. If they were trespassers, how did they commit the trespass? Peaceably and quietly, or violently and riotously? How far off were defendant and his employees? How far his wife? How far Charles Brooks and Dan Mitchell? How far John B. Pressley? What were they doing? Were they armed? All these are pertinent inquiries to aid you in passing upon the further facts in the case. As against trespassers, two methods of redress are frequently presented to the injured party, the one by invoking the aid of the officers of the law, the other by the owner's becoming judge and executioner of the law in his own behalf. When one adopts the latter course, the law requires of him the exercise of great care lest he in turn become an offender.

Were Edward Pressley, jr., Charles Pressley, and Edward Pressley, sr., killed in this county on November 18, 1885? You have heard a number of witnesses testify to the fact, among them the defendant. Do you believe it? If so, who killed them? You have heard the testimony of Charles Brooks and the defendant on that subject. Do you believe them, or either of them, so far as to say that defendant did it? If so, then it only remains to look into the circumstances of the killing to find the motive—intent; whether with malice; on sudden heat and passion without malice; or without fault on his part to preserve his own life or his body from serious harm. As this is decided, so will be the crime—murder, manslaughter, or self-defence. Malice is called malice aforethought, and this is true; it must be formed prior to the killing, but it is sufficient if it be but a second before, so that it be wilfully done.

Now, let us go back to inquire into the relation of defendant to the Pressleys. Was it kindly? If so, when and where? Had defendant done anything particularly showing kindness on

his part to them ? If so, when ? Was there a family relation between them ? If so, how close, and how long since it was formed ? Did these kindnesses and family relations, if such existed, influence defendant to go in with Charles Pressley in the purchase of the Jennings land ? Did they go into such purchase ? If so, did defendant spend nearly all the money he had in such purchase ? Were all the Pressleys recognized by defendant as interested in such purchase, and Charles's name alone used merely for the sake of convenience ? Did Charles agree that defendant could have about fifty acres of that land free of rent as long as he could keep it ? If so, did Charles attempt to repudiate that agreement; and did that intent become known to defendant for the first time on Monday before the killing and through Edward Pressley, sr. ? If so, what feelings did it beget in defendant ?

To solve the last question your general knowledge of human nature may be brought to bear upon the evidence adduced on the stand as to the conduct of the parties. If Edward Pressley, sr., and defendant met on Monday previous to the killing, under what circumstances ? what was their conduct towards each other, and what was their feeling toward each other when they parted ? Did Robert Jones on Monday or Tuesday before the killing make threats against the Pressleys, as testified to by Dan Mitchell and Sam Mitchell ? You heard their testimony and the contradiction of it. It is for you to determine. How far can the noise, if any, of the ploughman be heard ? How near was defendant to the Pressleys the day they were killed ? Did he work near them ? Did he walk near them ? Did he get his gun ? If so, where, and for what purpose ? Where did he first see the Pressleys, and where first hear them, if at all, on that day prior to the immediate time of the killing ? Did they go to the defendant just prior to the killing ? Did he go to them ? . If either, had they (Pressleys) been at work just before the killing ? How near to his latest work was each killed ? How did the fighting commence ? Defendant alone testifies to that. Did he speak truly ? You know and have had his testimony, and as to his character both for peaceableness and veracity. You saw his manner on the stand. You are to decide the facts. You may

believe him in preference to every other witness, or you may believe any other witness in preference to him, or you may disbelieve the whole or any part of what he says—exercise your impartial judgment,

You have also heard the testimony of Charles Brooks as to the killing of Edward Pressley, jr. You saw him on the stand. You know him; you have heard witnesses testify as to his character, and also as to the probability of his having been able to hear and see the transactions of which he testifies; also as to contradictions and corroborations of his testimony. You also heard defendant testify as to this killing, as also that of Charles Pressley. Are their statements reconcilable? On which will you rely, if on either? Which of the Pressleys was killed first? If defendant had any ill-will against them, against which one would he have had the most? All of these inquiries, and many others which will doubtless suggest themselves to you, gentlemen of the jury, are merely preliminary to the issue. As to the character of the killing of Edward Pressley, sr., the same two witnesses— Charles Brooks and the defendant—testify as to the manner of that.

For the purpose of refreshing your memory I will read what the stenographer has taken down as to what Charles Brooks and the defendant said. You are to judge of its correctness. I will take them in their order, and read you their testimony in regard to the particulars of the killing; you are to judge as to whether the testimony is the testimony as given on the stand.

MAJOR GARY.[1] (Interrupting his honor.) I do not know whether it is necessary for me to object to its being read. I do not know of any precedent for it. I object to its being read from the stenographer's transcript.

JUDGE NORTON. Mr. Stenographer will please note exception for Major Gary.

Gentlemen of the jury, I will read it to you as my statement of what the testimony is:

CHARLES BROOKS'S testimony:

"Mr. Pressley went on back where his boys, Edward and Charley, were ploughing; just as he got out of sight of me I

---

[1] Defendant's attorney.

heard a gunshot shot off twice; immediately afterwards I heard somebody holler; I looked in the way they were ploughing; I saw two men running, Jones in front and young Edward Pressley behind him; just as he got to the pine thicket Jones stopped; Edward Pressley ran up to him; I saw them clinch one another; he seemed like he was using his arm like he was using his knife.

"Q. Which Pressley ran after him?

"A. Young Edward Pressley; just in a few minutes Edward Pressley fell; then Mr. Jones walked off from him towards old man Pressley and stopped; he stopped and loaded his gun, and immediately after he got it loaded he walked in about five or ten steps of old man Pressley; he said to him, 'Dog gone you, I will shoot you'; immediately as he spoke, he shot and Mr. Pressley fell.

"Q. How far were you from the scene of difficulty?

"A. Something like 300 yards. When he shot old man Pressley I had walked about 75 yards from my crib that way and stopped; I had walked nearer to them.

"Q. How long was it after Edward Pressley, jr., was shot when you walked toward them?

"A. About five minutes.

"Q. Was that before or after old man Pressley was shot?

"A. Before. While he was loading his gun I walked that distance.

"Q. How far were you then from Jones?

"A. Something like 200 yards.

"Q. At that time?

"A. Yes, sir.   *   *   *   I heard Mr. Jones say to Mr. Edward Pressley, sr.: 'Dog gone you, I will shoot you.' Just as he spoke he raised his gun and fired.

"Q. What did Edward Pressley, sr., do?

"A. He fell, from all I could see."

Here is the prisoner's statement:

R. T. JONES's testimony:

"Q. What did you find them doing when you got there?

"A. As I got close to them they stopped ploughing; they unhitched the horses before I stopped; I approached Charlie; he had been ploughing, and I said: 'Charlie, I told grandpa the

other day none of you must plough in my land until it is decided.'
I says : 'I am perfectly willing to leave it to three disinterested
men to say what rights I have ; if they say I should pay rent, I
am willing to do it, or if they say I should lose the land, I am
willing to lose the land.' I told him (Charlie), 'I would rather
you get off here until it was decided.' He says : 'We don't
intend to get off the land at all ; if you don't leave it, we will kill
you.' At the same time he made at me ; as he raised from the
plough he pulled his hand out of his pocket with something in
his hand which I supposed was a knife ; I believed it was a knife
then, and I believe it now ; he made at me with his hand drawn ;
at the same time they were all making to me ; Charlie came
this direction (indicating) ; Edward was behind ; I was between
them ; Mr. Pressley was a little below me ; they were all making
to me ; at the same time Charlie made at me ; as he was com-
ing I told him to stop. 'Charlie, don't come to me ; if you
do, I shall have to shoot you.' He still advanced on me ; I think
Ed. threw a rock at me ; as I looked around he had rocks in his
hand ; a rock brushed my hat ; about the same time Charlie was
making at me in front with his knife ; Ed. threw a rock ; that
time I drew my gun on Charlie ; he had got so close I was
obliged to shoot him to keep him from killing me ; at the same
time Ed. was making right at me ; he (Charlie) had his knife
drawn this way (indicating) ; as well as I remember he made to
run under me ; this hand was drawn this way (indicating) ; I had
my gun drawn and says : 'Stop, or I will kill you' ; he stooped
to run under and I shot him ; at this time Ed. was on me, with
a large rock in his right hand ; as I went to turn round he was
close enough to strike me.

"Q. Why didn't you shoot him ?

"A. He could have caught my gun ; I didn't have room to
get my gun on him ; I run then about 30 steps, I reckon ; he
was on me all the time ; was so close, almost right on me, I
couldn't defend myself with my gun ; after running some dis-
tance I found he would catch me, and I could not defend myself
with my gun ; I got my knife ready ; as I whirled on him he
had a rock drawn and struck at my head ; he struck my breast
with a rock, on my collar bone ; I had my gun ; he still held a

rock in his right hand, still continued to strike me in the face and head; I defended myself the best I could until I got my knife ready; he struck a second lick on my arm; bled pretty considerably; by this time I got my knife ready; I cut him to keep him from killing me; he was doing his utmost to kill me; I had to kill him to keep him from killing me; I was running to a thicket; when I got to the edge of the pine, when I found he would catch me, I turned, and, as I whirled, he struck me on the breast; as soon as I got away from Ed., I started back to my house; I started in that direction; Mr. Pressley made for me then with a large stick in his left hand and something in his right about the size of a pistol; I supposed it to be a pistol; he cut me off from my house; made at me; as he did, I told him, I says: 'Mr. Pressley—grandpa, don't come to me—if you do, I will have to shoot you.' He says: 'I am going to kill you.' I says: 'Don't come any closer.' This time he was on me, making for me; he threw his right side this way (indicating), and I shot him as he was presenting his right hand in that position (indicating).

"Q. Was he making at you to fight you?

"A. Yes, sir; I told him two or three times, if not four times, not to come any closer; he had something in his hand that resembled a pistol more than anything else."

It is testified that the defendant surrendered himself very promptly and didn't seek safety in flight. What inference do you draw from that? The defendant endeavors to show that the only witness produced by the State to prove that he was an eye witness to the killing of the Pressleys was not in a position to see and hear what he testifies to. Did the defendant think at the time that there was no other eye witness to the killing of Charles and Edward Pressley, jr., than Edward Pressley, sr.? If so, do you infer any motive from that? You may not be able to answer one or more of these questions and such others as will present themselves to you when considered singly or in groups; but you not only may, but it is your duty, to take all the testimony together and upon a consideration of the law find the facts.

Let us return now to the definition of the three degrees of homicide. We will take them in their inverse order, and, begin-

ning with self-defence, we find that to plead that successfully defendant must have done the killing, if he did it, believing at the time that he was in imminent danger of death, or of serious bodily harm, and without other means of escape, and without wilfully putting himself in that position of danger; and not only must he believe it, but a man of reasonable firmness, under the like circumstances, must have believed it. Was defendant in fault? Was he on land to which he had the right of possession? From what point did he approach Edward Pressley, sr. ? For what purpose? Was it to order Edward Pressley, sr., from the land? If not (and there is no evidence tending to prove it; on the contrary, defendant testifies that he was on his way home), the possession of the land can have no influence in determining the question of self-defence in the case of the killing of Edward Pressley, sr., whatever influence it may have had in determining the question of self-defence as to the killing of Charles Pressley and Edward Pressley, jr. Was the defendant simply going home? Did he observe Edward Pressley, sr., before he came within dangerous proximity to him?

From any circumstance of a day or two, or of only a few minutes previous, did defendant have a right to expect a difficulty in his approach to Edward Pressley, sr., if he did approach and did see him? If so, then the evidence would tend to show that he was not avoiding, but, on the contrary, was willing to engage in the difficulty; and if that theory be adopted by you, the law of self-defence will not apply, much less if you should find any previous malice. If, on the other hand, you believe that defendant was simply on his way home, and didn't observe Edward Pressley, sr., until he was, as he supposed, in imminent danger of life or serious bodily harm by an assault from Edward Pressley, sr., then the law of self-defence will apply, provided you believe, further, that a man of ordinary firmness, under the circumstances proven, would have believed the same thing. Not whether Edward Pressley, sr., had a pistol, or whether, if he had, he could have endangered the life of defendant if he had attempted to use it; but whether defendant had knowledge which would have prevented defendant from believing that he had a pistol, or that, if he had, his condition was such as to prevent him from being able to

use it effectively. In other words, did he or not, being in fault, believe, and have a right to believe, that his life, &c., was in imminent danger? If you so conclude, that ends your investigation.

The distinction between the defence in this case and the law, that a deadly weapon cannot be used to prevent a trespass or drive out a trespasser, as I understand it, is this : there it was merely to prevent the trespass or drive out the trespasser; here, assuming that there was a trespass, according to the defence, the owner proceeded to request the trespassers to depart; that thereupon such a violent assault was made upon himself that his life and limb were in danger, and he used the gun, which he accidentally had in his hand, not to eject the trespassers, but to defend himself from their unlawful and unexpected violent assault. If the facts are so, the use of the gun would not compel you to find an unlawful killing; but if you decide that the facts do not warrant the conclusion of killing in self-defence in this particular case, though it might in the other cases (you are not trying the other cases, you are trying this particular case), a verdict of not guilty would not be warranted. Then you will inquire whether there was any malice, or whether the killing of Edward Pressley, sr., was in sudden heat and passion; was the original onset a sudden affray between the parties without any premeditation on the part of either, so as to make the killing of Charles and Edward Pressley, jr., without malice, and was Edward Pressley engaged in that difficulty? Did the defendant go at a safe distance from Edward Pressley, sr., and voluntarily return to the attack upon him? If so, did the defendant have time to cool before that return? Then it would be manslaughter.

But, gentlemen, if on a review of the facts you come to the conclusion, beyond a reasonable doubt, that the defendant did, on or about November 18, 1885, kill Edward Pressley, sr., with malice express or implied, then you will find him guilty of murder. Malice is sometimes inferred from the weapon used, but, when the circumstances of the killing are proven, then the jury will judge from them whether there was malice. "Express malice is when one person kills another with a sedate, deliberate mind and formed design, such formed design being evidenced by

external circumstances discovering the inward intention; as lying in wait, antecedent menaces, former grudges and concerted schemes to do the party some bodily harm. And malice is implied by law from any deliberate, cruel act committed by one person against another person, however sudden; thus, where a man kills another suddenly without any or without a considerable provocation, the law implies malice; for no person, unless of an abandoned heart, would be guilty of such an act upon a slight, or no apparent, cause."

The defendant's counsel have asked me to charge you certain propositions of law, and I shall be under the necessity of refusing some of them; but, gentlemen, you must not infer from the refusal that there is no good law in the propositions that they state; that is, I refuse some of them, perhaps, upon the ground that they are not applicable to this case; others, perhaps, on the ground that there is an objectionable word, or something of that kind in it, which don't compel me to charge it; but I think I have included pretty well in my charge the substance of the requests to charge, and, where I have not, I will endeavor to give you the law upon those particular subjects.

I am requested to charge you:[1] "There is one thing I would mention. Suppose you come to the conclusion that the prisoner at the bar was in rightful possession of the land, although it had been rented by the State authorities to the deceased. Suppose you come to the conclusion that, as between the deceased and the prisoner, he had the right to be on that land—the law is very clear there—you have a right to say to your neighbor, don't you come on my land; but if he persists to come on your land, you have the right first to order him to leave. If he refuses to leave, then you may put your hands upon him lightly to remove him. If he resists you, why, then you may use such force as is necessary to remove him, even though it costs him his life. That is the law. You must use every effort in your power to get him off your land before you resort to violence or a deadly weapon. But if the party rushes upon you with drawn knife,

---

[1] What follows does not read like a request to charge and is not in the form of the other requests. But the 16th exception alleges error in a refusal so to charge. It is printed as it appears in the Brief.—REPORTER.

that makes a difference; but that is one of the questions of facts which you are to decide." I have declined to charge you that, as law: 1st. "That a party rightfully in possession of land is entitled to the peaceable possession of it, undisturbed by the interference even of the real owner, until his rightful possession has legally terminated; and even the rightful owner may not enter by force to acquire the possession of the land, even if wrongfully withheld from him." That is good law, gentlemen, but it is not applicable to every phase of this case, as I have already indicated to you in my main charge; but it may be applicable in some of the views that you may take of the case.

2nd. "That rent is not essential to the existence of a tenancy, and to terminate a tenancy from year to year, unless there is an agreement to quit, there must be a notice given, as required by law, to quit, and in a tenancy from year to year the tenant holds to the end of the calendar year." I have charged you that already.

3rd. "That a tenant, in the rightful possession of lands may legally approach any person wrongfully upon the same, and may legally order the person trespassing to leave or quit the possession of the land." I have already charged that in substance. I charge you that is good law.

4th. "That a tenant in the rightful possession of lands may lawfully approach any person wrongfully upon the same and may order the person trespassing to leave or quit the land, and in the event of a refusal so to do, may use such force as may be necessary to eject the trespasser; and if the party is resisted by force in the attempt to eject the trespasser, he may legally defend himself and repel force by force, using only such force as the fierceness of the attack may render necessary to defend himself." I charge that.

5th. "That while the law presumes malice from the mere fact of intentional killing, yet when all the facts are brought out in the evidence, there is no room for presumptions, and the State affirming malice must prove it." I charge that with this modification: that presumptions may be a part of the evidence, and the State must have the preponderance of the evidence on the whole case.

6th. "That the law justifies a man in repelling force by force in the defence of his person, habitation, or property against one or many who manifestly intend and endeavor by violence or surprise to commit a known felony on either. He is not obliged to retreat, but may pursue his adversary till he finds himself out of danger ; and if in a conflict between them he happens to kill his adversary, such killing is justifiable. The right of self-defence in this kind is founded on the law of nature." There is some good law in that, but its merits are not applicable to this case, and I refuse to charge you.

7th. "That if one is assaulted by another who has threatened to kill him, he is not bound to run and escape in the particular instance, thus increasing his danger by encouraging his assailant to repeat the attempt, when he will perhaps be less prepared to resist." I refuse to charge you that, but charge you this instead : that a mere threat to kill is not sufficient to justify one in killing one who assaults him, unless he believes that the assault· at the time has put him in danger of serious bodily harm, or life or limb.

8th. "That an offer to strike by one person rushing upon another will be an assault although the assailant be not near enough to reach his adversary, if the distance be such as to induce a man of ordinary firmness under the accompanying circumstances to believe that he will instantly receive a blow." That is good law.

9th. "That if the jury believe from the evidence that the defendant killed the deceased under circumstances calculated to excite the fears of a reasonable man of ordinary firmness that it was necessary to save his life or his limb or his person from serious bodily harm, and that he acted really under the influence of those fears and not in a spirit of revenge, he is not guilty and should be acquitted." He must have have come into those circumstances, gentlemen, without fault on his part. For instance, if you, Mr. Foreman, should challenge me to fight and I should go to meet you, and you happen to make the first assault, I would not be justified in killing you ; it would not be self-defence ; I would not be entitled to an acquittal because it was a mutual combat. With that modification, that is good law.

10th. "That if the jury believe from the evidence that the

defendant felt at the time deceased was killed, and had reason to feel from the circumstances, that it was necessary, to save his life or his limb or his person from serious bodily harm, to kill the deceased, then the prisoner, if he acted under the influence of such fears and not in a spirit of revenge or malice, is not guilty and should be acquitted." That is not sufficient; does not come up to the standard of self-defence, and I refuse to charge it.

11th. "That to entitle the prisoner to the benefit of the requests 9 and 10 above, it is not necessary, nor does the law require, that the proof should satisfy the jury that the killing was necessary to prevent a felony, but an attack of a less serious nature may suffice." The words of that request are too general. I can only charge it, by adding that he must have believed that he was in actual danger of serious bodily harm, loss of life or limb, and that a reasonable man under the same circumstances would have been induced to believe the same thing.

12th. "That if the jury believe from the evidence that the facts and circumstances as they appeared to the prisoner were sufficient to excite the fears of a reasonable man that it was the purpose of the deceased to perpetrate a felony upon him, or to do him serious bodily harm, and that the prisoner acted under the influence of these fears and not in a spirit of malice or revenge, then under the law the prisoner is excusable, not guilty, and should be acquitted." That seems to me to be a repetition of what has gone before, and I charge you as I have charged you in reference to the other, that he must not voluntarily have put himself within the danger to which he was exposed.

13th. "That when one is attacked by one or many in such manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life, or to do him some serious bodily harm less than taking his life, and there is reasonable ground for believing the danger imminent that such design will be accomplished, he may safely act upon such appearances and kill the assailant if that be necessary to avoid the apprehended danger, and the killing will be justifiable or excusable, although it may afterwards turn out that the appearances were false, and there was in fact neither design to do him serious injury or to kill him, nor danger that it would be done."

With the modification I have just given, he must not have sought his position of danger, that is good law.

14th. "That where a prisoner is sworn as a witness in his own behalf the credibility of the witness and the statement of the prisoner is a question of fact for the jury, and they may accept his statements in his own behalf in preference to the sworn testimony of any or all other witnesses sworn in the case, or they may attach only such importance to it as their conclusions, honestly formed, may warrant them in doing. The statements of the prisoner under oath in the case may be attacked as those of other witnesses in the manner prescribed by law, and a failure so to attack it, or an unsuccessful attack upon it, is a proper matter for the consideration of the jury in reaching a conclusion as to the truth of his statements and the guilt or innocence of the prisoner." As to the failure to attack a witness, I instruct you, gentlemen, that is good law: but I want to explain to you a little further that the failure to attack the witness is no reason why his testimony should be believed. You judge of his testimony, not because it has not been attacked, but because you judge it to be true or untrue, whether it is the prisoner or any other witness; you may know he is not telling the truth; his falsehood may have begun at this time. It is your knowledge of the witness, upon such testimony as has been adduced as to his character, his conduct upon the stand, and attach such importance to it as you may deem proper, no more, no less.

15th. "That if from the evidence the jury entertain a reasonable doubt as to the guilt of the accused, or as to whether the prisoner killed the deceased, or as to whether, if the prisoner killed the deceased, the prisoner acted under circumstances calculated to excite the fears of a reasonable man, or whether, if he killed the deceased, he felt at the time, and had reason to feel under the circumstances, that it was necessary to kill the deceased to save his own life or limb or his person from serious bodily harm, or whether the prisoner, if he killed the deceased, was influenced by such fears and such necessity and not by malice or revenge, then it is the duty of the jury to give the prisoner the benefit of all reasonable doubts and to acquit him." You are to give the prisoner the benefit of all reasonable

doubts, but you are not to single out any particular question and say upon that you have reasonable doubts, and therefore the prisoner must be acquitted. You must take the whole testimony and weigh all the circumstances, and, after weighing all the circumstances and facts, if you are still in reasonable doubt as to the facts as applicable to the law as I have given it to you, then you will give the benefit of that doubt to the prisoner.

16th. "That it is the duty of the jury, if they entertain any reasonable doubt of the law or of the facts of the case, or of the application of the facts to the law of this case, to give to the said prisoner the benefit of such doubts as by law they and each of them are required to do." Gentlemen, if you have any doubt about the facts you will give the prisoner the benefit of them. If you have any doubt about the law, if you will come in court, I will try and settle that matter. I cannot charge that. You will take your law as you have been told from the court. I do not know that I can make the law to you in this case any plainer.

If you find that Edward Pressley, sr., was killed by R. T. Jones, in this county, in the time named in the indictment, with malice, either express or implied, then your verdict would be simply "Guilty." If you find that he killed him unlawfully without malice, in sudden heat and passion, as I have before explained the law to you, your verdict would be "Guilty of manslaughter." If you come to the conclusion that he killed him in self-defence, not being in fault himself, under such circumstances as gave to him, and would give to a reasonable man, serious apprehension that he would meet with great bodily harm or the loss of life and limb, then it would be self-defence, and your verdict will be "Not guilty."

Give the record to the jury.

Saturday night 11.10 p. m., the jury were called in and addressed as follows by the court:

JUDGE NORTON: Mr. Foreman and gentlemen, three days of the court have been occupied in the trial of this cause. To go over the case again would involve a very great expense and a very great inconvenience to a great number of persons. If it is possible, I would like for this jury to agree upon this case, and

I shall ask you to retire to your rooms again and further consider the matter; but before I do so, if there is any question of law upon which I can enlighten you any, I will be glad to do so.

THE FOREMAN: Not a question of law.

THE COURT: Question of fact. If you agree upon your verdict any time to-night, to-morrow, Monday, any time, you may send for me and the counsel engaged in the case, and we will come in court, receive your verdict, and discharge you at as early an hour as possible.

NOTE BY THE STENOGRAPHER: The above transpired without the presence of the prisoner, R. T. Jones.

Sunday morning, March 13, 1887, at 4.20 a. m., the jury brought in a verdict of "Guilty of manslaughter."

The defendant being sentenced, appealed to this court upon the following exceptions:

1. Because his honor erred in refusing to permit the prisoner to have L. S. Mellichamp sworn and examined on his *voir dire* when presented as a juror to the prisoner.

2. Because his honor erred in ruling that the defendant could not introduce in evidence the testimony of Charles Brooks, a witness for the State, taken at the coroner's inquest in writing, sworn to and signed by the said Charles Brooks, the purpose of such evidence being to contradict the said Charles Brooks, the proper foundation having been laid.

3. Because his honor erred in ruling that J. W. Johnston, the coroner, could not testify to the substance of what Charles Brooks testified at the coroner's inquest upon the point with reference to which the foundation had been properly laid for his contradiction.

4. Because his honor erred in ruling that the defendant could not introduce in evidence as an affidavit the evidence of Charles Brooks at the said jury of inquest, which was reduced to writing, sworn to and subscribed by the said Charles Brooks, the purpose being to contradict the said Charles Brooks upon the points with reference to which the foundation of his contradiction had been properly laid.

5. Because the State having introduced evidence to impeach the credit of Pickens W. Hughes, a witness examined on the

part and in the behalf of the defendant, his honor erred in refusing to permit the defendant to call witnesses to give evidence in reply to show that the witness (Hughes) was worthy of credit.

6. Because his honor erred in permitting the argument of the case to proceed in absence of the prisoner, the court having taken a recess for dinner, and the counsel having proceeded with the argument before the prisoner had been brought into court, and in ignorance of the fact.

7. Because his honor erred in not permitting the leading counsel in the case, viz., Wm. T. Gary, further time to conclude his argument, he having stated before the commencement of his argument that he would not be able to do justice to the case within the time limited by law, and having asked for further time, and when stopped by the court at the expiration of the time allowed, having informed the court that he had not finished his argument, and having asked for further time, which was refused, he having then and there excepted.

8. Because his honor erred in returning to the court room at about eleven o'clock Saturday night, and, after the jury had been deliberating on the case for several hours, in ordering the jury into the court room, and again charging and instructing the jury in the absence and without the knowledge of the prisoner, who during the whole of that time was not present, but in jail, where he had been remanded after the case had been first submitted to the jury.

9. Because his honor erred in charging the jury that the attorneys on either side are not supposed to be impartial, and that the jury are to take their statements both on the law and facts guardedly.

10. Because his honor erred in charging the jury, "That a juror can neither consider any fact which comes within his personal knowledge, nor can he communicate it to the other jurors without being in contempt of the court, and violating his solemn oath," thereby excluding from the consideration of the jurors their personal knowledge of the witnesses in reaching a conclusion as to their credibility.

11. Because his honor erred in charging the jury, that if the court mistook the law, the court could be corrected.

12. Because his honor erred in charging the jury that homicide in self-defence is where one who hath no other possible means of preserving him from death or great bodily harm by one who combats with him on a sudden quarrel kills the person who reduces him to such inevitable necessity.

13. Because the Circuit Judge in his charge to the jury expressed his opinion in very decided terms as to the character of the homicide, in violation of the provisions of the constitution.

14. Because his honor erred in charging the jury in that he did not correctly or fairly define the law of self-defence.

15. Because his honor erred in charging the jury "that the possession of the land can have no influence in determining the question of self-defence in the case of Edward Pressley, sr."

16. Because his honor refused to charge as requested: "Suppose you come to the conclusion that the prisoner at the bar was in rightful possession of the land; that, although it had been rented by the State authorities to the deceased; suppose you come to the conclusion that as between the deceased and the prisoner, he had a right to be on that land. The law is very clear there. You have a right to say to your neighbor, don't you come on my land: but if he persists to come on your land, you have the right first to order him to leave. If he refuses to leave, then you may put your hands upon him lightly to remove him. If he resists you, why then you may use such force as is necessary to remove him, even though it costs him his life. That is the law. You must use every effort in your power to get him off your land before you resort to violence or a deadly weapon. But if the party rushes upon you with drawn knife, that makes a difference, but that is one of the questions of fact which you are to decide."

The 17th and 18th exceptions allege error in the refusal of the 5th and 6th requests, and in the remarks upon those requests.

19. Because his honor erred in charging the jury as to the general presumptions of malice arising by operation of law, because this rule does not apply when the facts and circumstances attending the homicide are disclosed in evidence so as to draw a conclusion of malice or want of malice as one of fact from the evidence.

Exceptions 20 to 23, inclusive, allege error in the refusal of

the 7th, 9th, 10th, and 14th requests to charge, and in the remarks upon those requests.

24. Because the charge of the court as a whole is less favorable to the prisoner than that to which he was entitled.

*Mr. W. T. Gary*, for appellant.

*Mr. Nelson*, solicitor, contra.

September 17, 1888. The opinion of the court was delivered by

MR. JUSTICE McIVER. The appellant, under an indictment for the murder of Edward Pressley, sr., was convicted of manslaughter, and being sentenced to twenty-five years' imprisonment in the State penitentiary, appeals to this court upon numerous exceptions—twenty-four in number. These exceptions make four general assignments of error: 1st. In empannelling the jury. 2nd. In ruling as to the admissibility of evidence. 3rd. In the conduct of the trial. 4th. In the charge to the jury.

The particular ground upon which the first assignment of error rests is that "his honor erred in refusing to permit the prisoner to have L. S. Mellichamp sworn and examined on his *voir dire* when presented as a juror to the prisoner." It appears, however, from the statement in the "Case" that there is no foundation in fact for this exception; for, although when the demand was first made that this juror should be examined on his *voir dire*, the State objected, and the court sustained the objection, yet immediately afterwards the objection was waived, and the juror was in fact examined upon his *voir dire*.[1] The fact that counsel for the prisoner had announced, before the objection was withdrawn, that they challenged the juror cannot affect the question. The prisoner was deprived of no legal right, and it is clear that this exception cannot be sustained.

The second general assignment of error will be considered under the several specifications in which it is presented by the exceptions; for a proper understanding of which it will be necessary

---

[1] Upon such examination he was declared a competent juror, and defendant again challenged him. It does not appear whether the prisoner exhausted his challenges.—REPORTER.

to make a brief statement. When Charles Brooks, who seems to have been the only eye witness of the killing, was on the stand, he was asked by counsel for prisoner whether, in his testimony at the coroner's inquest, he had not made certain statements differing from those made by him while on the stand as a witness in this case, which he denied, and in the defence the coroner was offered as a witness to prove what Brooks had testified on the inquest. For this purpose the coroner produced the proceedings at the inquest, containing the testimony of Brooks, as taken down by him and signed by Brooks, and when asked to read what Brooks had then said, the court, upon objection, ruled that while the witness might refer to the testimony in writing for the purpose of refreshing his memory, yet he must testify from his own memory and not from the writing. The witness was then asked if Brooks, at the inquest, made a certain statement, different from that made by him on the stand, to which he replied in these words: "To the best of my knowledge and belief he said that, Of course, I can't remember exactly the words." The question was then asked: "You remember that was what was substantially testified to?" which question was objected to and ruled out, and this is made the basis of the third exception— that the Circuit Judge erred in ruling that the coroner could not testify to the substance of what Brooks had testified to at the inquest.

After the cross-examination of the coroner, which seems to have been designed to show that the coroner was testifying from the paper and not from his memory as refreshed by the paper, the attorney general moved "to strike out the evidence given for the purpose of contradiction," upon which motion the court reserved its decision until the close of the testimony, when the decision was announced in these words: "I shall decline to strike out the testimony, leaving the jury to say how far the witness was able to testify on that question as a matter of fact;" and in response to an inquiry from counsel for the prisoner whether that ruling included the testimony taken at the inquest, answered that it did not; whereupon prisoner's counsel again insisted upon their right to offer the testimony taken at the inquest, which was again denied. After the failure of counsel for prisoner to get in

the testimony of Brooks at the inquest, he then offered that testimony as an affidavit of Brooks, and this being rejected, constitutes the basis of the 4th exception.

As we understand the matter, the precise questions raised by the second, third, and fourth exceptions are these : 1st. Whether, when the purpose was to contradict the witness Brooks, it was competent for the coroner, who had taken down his testimony at the inquest in writing, to prove what he then said, by reading what he had then taken down, or rather so much of it as Brooks denied saying, or whether he must speak from his memory alone, refreshed by looking at the paper. 2nd. Whether, in speaking from his memory alone, he was at liberty to state substantially what Brooks had said at the inquest, or whether he must confine himself to the language then used by Brooks. 3rd. Whether the testimony of Brooks, taken at the inquest and signed by him, could be offered in evidence as an affidavit of Brooks, for the purpose of showing what he had previously stated in regard to the occurrence as to which he was called to testify.

It is a little singular that neither our own researches nor those of the counsel engaged in this case have been able to supply us with any direct authority upon the precise point raised by the first question presented by these three exceptions ; but it seems to us that both upon principle and analogy the ruling below can be shown to be erroneous. It will be observed that the question here is not (as it was in *State* v. *Campbell*, 1 Rich., 124), whether the testimony of a witness, who has subsequently died, taken at a coroner's inquest, is competent evidence *against the prisoner*, though even that point was decided by a divided court, and is the subject of some conflict of authority elsewhere ; but the question here is as to what a witness said on a previous occasion. It seems to be conceded that any one who heard Brooks's testimony at the inquest would be competent to prove, from his own memory, what Brooks then said, and, upon well settled principles, it seems to us that one who not only heard the testimony, but took it down carefully in writing at the time it was delivered, would be equally competent to prove from such writing what the testimony actually was. Indeed, the testimony in the latter case would be more satisfactory than in the former, for there would be

a greater certainty that one who was testifying from a writing made by himself at the time could accurately and fully reproduce the testimony in question, than one who relied upon his memory only.

This view is not entirely without the support. of authority. Thus in *Phillips on Evidence*, 297, it is laid down that where informations are judicially and regularly taken, and the informant is afterwards examined as a witness at the trial, the information given by such witness may be used, on the part of the prisoner, to contradict his testimony; and as an example of this, *Lord Stafford's Case* (3 St. Tr., 131) is cited, where the depositions of a witness, taken before a justice of the peace, were read at the instance of the prisoner, "in order to take off the credit of the witness by showing a variance between the depositions and the evidence given in court *viva voce*." In *State* v. *Rawls* (2 Nott & McC., 331), it was held that a witness who had made a memorandum in writing of certain facts at the time such facts occurred, for the purpose of perpetuating the memory of them, and could at any subsequent period swear that he had made the entry at the time for that purpose, and that he knew, from that memorandum, that the facts did exist, it would be good evidence, although he might not retain a distinct recollection of the facts themselves. This case has been recognized in several subsequent cases. *Cleverly* v. *McCullough*, 2 Hill, 446 ; *Bank* v. *Zorn*, 14 S. C., 451 ; *State* v. *Collins*, 15 *Id.*, 373.

It is true that neither in the case of Rawls nor in any of the other cases cited was the testimony in question offered for the purpose of contradicting a witness, but for the purpose of establishing some fact material to the issue ; but we do not see how this can affect the question under consideration. If such testimony is competent to establish a fact material to the issue, we can see no reason why it should not be competent for the purpose of contradicting a witness, provided always that the proper foundation for such contradiction has been laid, as to which there is no question in this case ; for the witness, Brooks, was fully advised, and his attention specially called to what he had said at the inquest. The principle in both cases is the same, and the rule should be the same. The nearest approach to a distinct

decision of the precise question under consideration which we have been able to find is in the case of *The Charles Morgan* (115 U. S., 69), where the depositions of a witness made in another case were received in evidence for the purpose of contradicting such witness; for while it is said in *State* v. *Prater* (26 S. C., 203), that the evidence of the witnesses as taken down by the coroner at an inquest "would seem to constitute the best and highest evidence of what a witness may have testified to before the coroner," that seems to have been a mere passing remark, and can scarcely be regarded as an adjudication of the question.

We are now, however, after full consideration, prepared to adopt and affirm fully the proposition there stated. It is in full harmony with, and rests upon the same principle as, the doctrine declared in the case of *The State* v. *Branham* (13 S. C., 397), where it was held that when a party charged with crime makes a statement at the preliminary hearing before a trial justice, which is taken down in writing, and such statement is relied upon as a confession by the accused, the written statement is the best evidence upon the subject, and parol evidence as to what the accused said is incompetent where the written statement can be produced. For, as is well said by Mr. Justice McGowan in that case, "From the infirmity of memory there is always more or less uncertainty about parol testimony, especially in reference to declarations—mere spoken words." So here, we think, that the best evidence of what Brooks said at the coroner's inquest was his testimony as taken down by the coroner, a public officer charged with that special duty, at the time the words fell from the lips of the witness—much better than the recollection of the coroner, even when refreshed by reference to the written testimony; and we think it was error to rule otherwise.

It is true that, in the case of *The State* v. *McElmurray* (3 Strob., at page 42), there is a *dictum* of Judge Frost in these words: "The memorandum of the testimony of the witnesses, examined before the coroner, taken by a person who was present, would not be competent evidence, if it were proved;" and the fair inference is that this language was used in reference to the competency of such testimony to contradict a witness examined for the State; for, under the case of *The State* v. *Campbell,*

*supra*, such testimony would be clearly incompetent *as against
the prisoner.* But even assuming that the language was used
solely with reference to the competency of such testimony for the
purpose of contradicting a witness, it cannot be regarded as a
*decision* of the question, for no such testimony was offered, and
hence no *ruling* upon that question could have been made, and
the remark must be regarded as a mere *obiter dictum* upon a
point not arising in the case, and manifestly not considered by
the court. Indeed, it seems to be assumed in that case that the
affidavits made by two of the witnesses for the State before the
magistrate who issued the warrant, would be competent for the
purpose of contradicting those witnesses, though, for a like rea-
son, the case cannot be regarded as deciding that point.

This is the question made by appellant's fourth exception ; for
when the court ruled that the coroner could not read the testi-
mony of Brooks taken by him at the inquest, for the purpose of
showing that the witness had then made a statement different
from that made by him on the stand, counsel for the prisoner
then offered to read that testimony for the same purpose, as an
affidavit or written statement signed by Brooks, which was ruled
incompetent. If Brooks had, on the day of the homicide or
shortly afterwards, written a letter, or procured some one else
to write a letter for him, which he signed, giving an account of
what he saw of the conflict between the prisoner and the de-
ceased, it is difficult to conceive of any good reason why such
letter should not be competent to show that the account then
given by him was different from that given by him when exam-
ined as a witness in the case. Accordingly we find it said in 1
*Starkie on Evidence,* part II., page 145, upon the authority of
*DeSailly* v. *Morgan* (2 Esp., 691), that the credit of a witness
may be impeached "by proof that he has said or written that
which is inconsistent with his present testimony ; for this pur-
pose a letter may be read in which he has given a different
account of the matter." See, to same effect, 1 *Greenl. Evid.*,
section 463. The case of *Conrad* v. *Griffey* (16 How., 38),
clearly implies that such a letter would be competent evidence,
provided the proper foundation is laid by calling the attention of
the witness, whom it is proposed to contradict, to such letter.

The question presented by the third exception does not properly arise, for although the Circuit Judge did, when the question was first made, rule that a witness called upon to prove what another had previously said, with a view to the contradiction of the latter, could not testify merely to the substance of what such other witness may have said, but must confine himself to the language used; yet when his honor, at the close of the testimony, made his ruling upon the motion to strike out certain testimony, he in effect permitted the testimony of the impeaching witness, as to the substance of what the other witness had said, to stand, leaving it for the jury to say how far such testimony was a correct statement of what the witness proposed to be impeached had really said. But as we may be mistaken in this, inasmuch as the "Case" does not show clearly what was the scope and effect of the final ruling, we will consider whether there was any error in the first ruling.

Owing to the imperfection of the human memory, and the impossibility in many, if not in most, cases of reproducing by parol evidence the exact words which a witness may have used on some occasion previous to that when he is testifying, it seems to us that it would be too rigid and impracticable to lay it down as a rule that when a person is called upon to prove what another has said on a previous occasion, he must confine himself to the words used by such other person, and will not be allowed to state substantially what he has said. It seems from what is said in 1 *Greenleaf on Evidence*, section 165, and notes, that while the old rule was rigid in requiring that a witness called upon to prove what a deceased witness testified to at a former trial, must confine himself to the precise words used, and was not at liberty to give the substance of the testimony of such deceased witness, yet now it is generally considered sufficient if the witness is able to state the substance of what was sworn on the former trial. To the same effect, see *Hepler* v. *Mt. Carmel Savings Bank*, 97 Penn. St., 420; *S. C.* 39 Am. Rep., 813; and *Marler* v. *State*, 67 Ala., 55; *S. C.* 42 Am. Rep., 95, in which Mr. Justice Somerville uses this language: "The well settled opinion now obtains that the precise words need not be repeated on the second trial, but only the substance of the testimony given in the former trial."

The same doctrine is laid down by the Supreme Court of the United States in *Ruch* v. *Rock Island*, 97 U. S., 693. It seems to us that the same rule should apply in a case like the present.

Our next inquiry is whether there was any error in refusing to allow testimony to be offered for the purpose of sustaining the general character of Pickens W. Hughes, a witness for the prisoner, after his character had been assailed by the State in reply.

It seems to be universally conceded that where the general character of a witness is impeached by evidence tending to show that his character is so bad that he is unworthy of belief, the party offering the person so assailed has the right to introduce evidence in defence of his character; and, as is said by Earle, J., in *Farr* v. *Thompson* (Cheves, 37), this rule is designed for the protection of the witness himself, as well as of the party offering him. Indeed, it is laid down by such standard authorities as Phillips, Starkie, and Greenleaf, that even where the testimony of a witness is assailed by evidence that he has made contrary statements, evidence may be offered to sustain his character, though in this State that doctrine has been repudiated, and the privilege of offering evidence to sustain a witness's general character is confined to cases in which such character has been directly assailed by evidence. See *Chapman* v. *Cooley* (12 Rich., 654), where Wardlaw, J., draws a distinction between character and credit, holding that evidence tending to show that a witness has made contradictory statements in reference to the matter under inquiry is more properly an assault upon the credit rather than the character of the witness, and therefore does not open the way for evidence to sustain the general character of the witness, and that such evidence is admissible only when the general character of the witness is directly assailed. But as the general character of the witness Hughes was directly assailed by the State, it follows that even under the rule as restricted in this State, it was competent to offer evidence to sustain his character.

It is contended, however, that, under the well settled rules regulating the time for the offering of evidence by the respective parties, after the State had closed its testimony in reply, no further testimony of any kind could be offered by the defence. Such a view would not only practically defeat, but absolutely

nullify the well settled rule that where the general character of a witness is directly impeached, it is competent to offer evidence to sustain his character, and would place it in the power of the State to attack the character of any or even all of the witnesses for the defence, without the fear of any contradictory evidence. For it is quite clear that until the character of a witness is attacked, it is not competent to offer evidence to sustain it, as neither the witness nor the party offering him is at liberty to put his character in issue. It follows, therefore, that no attack upon the general character of a witness for the defence, by evidence directly assailing it, could be made until the State came to its reply, and if it should be held that, on account of the general rule in regard to the time for offering evidence, the defence could offer no testimony of any kind after the State has closed its reply, the inevitable result would be, that while the State or a plaintiff would have the opportunity of offering evidence to sustain the general character of any of their witnesses who may be attacked, the defence would in every case be deprived of such privilege. Such a one-sided and manifestly unjust rule cannot receive the sanction of this court.

The true view is, that when the State, or a plaintiff, attacks the character of a witness for the defence, a new issue is then raised, which could not have been before presented, and upon such new issue the defence has the right to offer testimony, as it could not before have been offered. It will not do to say, as has been said, that the view which we have taken, would lead to an interminable protraction of the investigation, and the controversy might go on indefinitely; for it must be rememered that the extent of the inquiry into character is sufficiently under the discretion of the court to prevent the evil result apprehended.

The sixth and eighth exceptions impute error to the Circuit Judge in proceeding with the trial in the absence of the prisoner. It appears that after a recess for dinner the senior counsel for the prisoner resumed his argument, and after he had been speaking for about five minutes, his junior mentioned to the stenographer that the prisoner had just been brought in, after the argument had been resumed, and requested him to make a note of it. "The stenographer makes this note, at the request of

counsel, but the fact, as reported by counsel, did not come within the personal knowledge or observation of the stenographer." We do not think this would furnish any ground for a new trial, for, in the first place, there is no *legal* evidence that the prisoner was absent at any stage of the trial. The mere statement of counsel, not brought to the attention of the court, though undoubtedly entitled to the highest credence as between man and man, does not furnish such *legal* evidence as courts act upon. The proper course would have been to call the attention of the court to the matter and had some adjudication or other action by the court upon it.

Again, it appears that after the jury had been out for some time, they were called in and asked if they desired any further instruction as to the law, to which they replied in the negative, whereupon they were told to retire to their room and when they agreed upon their verdict they could send for the judge and the counsel in the case, and have their verdict received and be discharged. When this occurred the prisoner was not present. We do not think this was any violation of the rule under which the prisoner is entitled to be present at every stage of his trial. What occurred was no part of the trial. There was no additional or fresh statement of the testimony and no instruction as to any matter of law—nothing that would constitute any part of a trial.

The next error assigned is in limiting the time of argument to two hours for each counsel. In view of the statute upon this subject (*Gen. Stat.*, § 2166), which expressly limits the time for argument to two hours for each counsel, "unless he shall first obtain the special permission of the court" to occupy a longer time, we see no possible foundation for this assignment of error, for the record shows that, before the commencement of the argument, counsel were distinctly informed that they would be required to keep within the limit allowed.[1]

The 9th exception alleges error in saying to the jury that the attorneys on either side are not supposed to be impartial, and that the jury are to take their statements both on the law and facts guardedly. There certainly was no error of law in this.

---

[1] There were two counsel on each side, and the judge allowed four hours to each side.—REPORTER.

The jury were not instructed to disregard the comments of counsel either on the facts or on the application of the law to the facts, but were simply cautioned to receive such comments guardedly, as they proceeded from persons who are not supposed to be impartial, and this was and is in every case strictly true.

So, too, there was no error in saying 'to the jury that if the court mistook the law, the court could be corrected, for this likewise is strictly true, and was no invasion whatever of the province of the jury ; nor should it have had any tendency to make the jury less particular in scrutinizing the facts, as is suggested in appellant's argument. This remark has been often made to juries, and we have never before heard its propriety questioned.

The tenth exception is in these words: "Because his honor erred in charging the jury 'that a juror can neither consider any fact which comes within his personal knowledge, nor can he communicate it to the other jurors without being in contempt of the court and violating his solemn oath,' thereby excluding from the consideration of the jurors their personal knowledge of the witnesses in reaching a conclusion as to their credibility." As we have often had occasion to say, the correctness of any legal proposition submitted to a jury is not to be tested by considering it abstractly—detached from the context in which it is found; but it must be considered in the connection in which it is found. So considering the language of the Circuit Judge above quoted, it is quite clear that there was no error, and no room for the inference that the jury were to exclude from their consideration, in reaching a conclusion as to the credibility of any of the witnesses, their personal knowledge of such witnesses. From the language of the Circuit Judge, immediately preceding that assigned as error, it would seem that one of the jurors accepted by the prisoner knew some fact material to the defence, or at least supposed to be so, and it was manifestly in reference to that juror alone that the alleged erroneous charge was made, and so applied, it was strictly correct.

The same general remarks may be made in reference to the 15th exception, for there certainly was no error in using the language there complained of in the connection in which it was used. The jury were told to inquire: "Was defendant in fault ? Was

he on land to which he had the right of possession ? From what point did he approach Edward Pressley, sr. ? For what purpose ? Was it to order Edward Pressley, sr., from the land ? If not (and there is no evidence tending·to prove it ; on the contrary, defendant testifies that he was on his way home), the possession of the land can have no influence in determining the question of self-defence in the case of the killing of Edward Pressley, sr., whatever influence it may have had in determining the question of self-defence as to the killing of Charles Pressley and Edward Pressley, jr." The plain meaning of the alleged objectionable language, in the connection in which it was used, was this—if the prisoner, after killing Edward Pressley, jr., was, as he himself testifies, on his way to his house, and was intercepted by Edward Pressley, sr., who approached him, with a stick in one hand and a pistol in the other—"made at me"— then clearly the possession of the land could have no influence in determining the question of self-defence in the case of the killing of Edward Pressley, sr., for such killing could in no sense be said to have been done in an effort to eject Edward Pressley, sr., from the land, but rather to protect himself from the alleged personal assault of said Edward, sr.

The 14th exception imputes error to the Circuit Judge in expressing his opinion to the jury as to the character of the homicide in violation of the provisions of the constitution. The point of this exception, as we learn from the argument of appellant's counsel, is, that the Circuit Judge, in speaking of the field where the fatal encounter occurred, characterized it as the "field of blood." We must confess that we are unable to perceive why such an expression could be regarded as any indication whatever of the judge's opinion as to the character of the homicide. Considering the undisputed fact that an aged father and his two sons had on the same day, and within a very short period of time, fallen by the hand of violence in that field, such an expression would be entirely appropriate, even if there had been the clearest and most indisputable evidence that this triple homicide was entirely justifiable. Indeed, after a careful consideration of the entire charge (which, for a full and proper understanding of this

decision, should be set out at large in the report of the case), it seems to us that the charge was eminently fair.

The 23rd exception is taken under a misapprehension of his honor's charge. He had already, in his general charge, instructed the jury in substance as asked in the first portion of the 14th request, which is made the basis of this exception, and after saying that the latter portion of the request—as to the failure to attack a witness—was good law, proceeded to explain further that the mere failure to attack a witness was not a reason why his testimony should be believed, as the jury must form their own conclusions from all the testimony in the case, as well as from the conduct of the witness upon the stand, whether his testimony was to be believed. From the charge as set out in the "Case," the judge does not appear to have used the language attributed to him in the latter part of this exception—"whether he (the witness) has been attacked or not, is not a matter which should influence you"—but, on the contrary, he had approved that portion of the request which declared that a failure to attack a witness, or an unsuccessful attack, was a proper matter for the consideration of the jury.

The 17th and 19th exceptions assign error to the Circuit Judge in charging as to the general presumption of malice arising from the mere fact of killing. He was requested to charge : "That while the law presumes malice from the mere fact of intentional killing, yet when all the facts are brought out in the evidence there is no room for presumptions, and the State affirming malice must prove it." This was charged with the following modification : "That the presumptions may be a part of the evidence, and the State must have the preponderance of the evidence on the whole case." It seems to us that there was error in thus modifying the request, especially as to the preponderance of the evidence. It has been held in two cases in this State (*State* v. *Colemar*, 6 S. C., 185, and *State* v. *Hopkins*, 15 *Id.*, 153), that while the law does presume malice from the mere fact of intentional killing, yet when the facts attending the homicide are brought out, there is no room for the presumption, and the State must prove the malice from the facts and circumstances attending the homicide, without any aid from the artificial pre-

sumption.　Of course, this, like all other facts, must be proved beyond a reasonable doubt, and not merely by the preponderance of the evidence.　This view has the support of that distinguished judge, Chief Justice Shaw, as well as of the courts of many of the States.　See *Commonwealth* v. *Hawkins*, 3 Gray, 463; *State* v. *Patterson*, 45 Vt., 308; and the other cases cited in a note to section 18 of 1 Greenleaf on Evidence, 14th edition.

All the other exceptions, except the 24th, which is too general to require further notice, impute error to the Circuit Judge in various forms in laying down the law as to the doctrine of self-defence.　Without considering these exceptions in detail, we think that the charge considered as a whole, except perhaps in one particular, is not justly amenable to exception, and that its correctness is sufficiently vindicated by the Circuit Judge in his general charge, as well as in his remarks upon the several requests to charge, all of which, as we have hereinbefore suggested, should be fully set out in the report of the case.　The particular exception above alluded to is in the use of the word "*possible*" in defining the law of self-defence, as follows: "Homicide, in self-defence, is where one who hath no other *possible* means of preserving him from death or great bodily harm, by one who combats with him, on a sudden quarrel, kills the person who reduces him to such *inevitable* necessity."　The word "possible" followed by the word "inevitable" is perhaps too strong. The law, recognizing the imperfections of human nature, does not require that one charged with homicide should show that there was no other possible means for escape when he struck the fatal blow, but he is only called upon to satisfy the jury that, under all the circumstances by which he was surrounded, he really believed there was a necessity for taking the life of his adversary in order to preserve his own, or to save him from serious bodily harm, and that, in the opinion of the jury, those circumstances were such as would justify such a belief.　*State* v. *McGreer*, 13 S. C., 464.

The judgment of this court is, that for the errors of law above indicated, the judgment of the Circuit Court be reversed, and that the case be remanded to that court for a new trial.

MR. CHIEF JUSTICE SIMPSON and MR. JUSTICE McGOWAN concurred in the result.