# Marler *v.* The State of Alabama.

## *Indictment for Murder.*

1. *Severance; worked by the insanity of one defendant and the separate arraignment of the other.*—When two p-rsons are jointly indicted, and one of them has been adjudged insane on a separate trial of that issue, and ordered to be confined in the insane hospital and his trial postponed until he becomes sane, and the other is subsequently arraigned and tried alone, there is a severance of the cases of the two defendants.

2. *Same; defendants competent witnesses after.*—Where two are jointly indicted and there is a severance, either of the defendants is a competent witness for or against the other.

3. *Insanity; not proved against defendant by special proceedings adjudging co-defendant insane.*—The record of the proceedings in the separate trial under the statute (Code, § 1488), in which one of two defendants who are jointly indicted, is adjudged insane, are not evidence against his co-defendant, of the fact of such insanity, on a trial under the indictment.

4. *Witness becoming insane; his testimony on a former trial admissible.* When a witness was examined on the preliminary investigation before a committing magistrate, and becomes insane before a trial of the accused, under indictment for the same offense, the testimony of such witness, as given before the magistrate, is admissible in evidence on the second trial.

5. *Same; may be proved by secondary evidence.*—When the testimony of such witness was not reduced to writing on the preliminary trial before the committing magistrate, secondary evidence of what he testified to, is admissible.

6. *Same; only necessary to state substance of testimony.*—The precise words

of such witness need not be repeated on the second trial, but only the substance of his testimony.

7. *Accomplice; what necessary to authorize conviction for felony on evidence of.* To authorize a conviction for felony on the testimony of an accomplice, his testimony need not be corroborated in every material particular, but it must be corroborated by evidence, tending to connect the defendant with the commission of the offense, and it is not sufficient if only so confirmed, as to convince the jury of its truth.

8. *Conspiracy to commit crime; how proved.*—Conspiracies to commit crime may be proved by circumstantial, as well as by direct evidence; and no positive agreement for such purpose need be shown.

9. *Same; may be proven by evidence of accomplice; when.*—Such a conspiracy may be proven by the testimony of an accomplice, if it be sufficiently corroborated, as to his statement connecting the defendant with the commission of the offense.

10. *Motive; evidence admissible to show.*—When defendant had begun suit against his wife for divorce, and his complicity in the killing arose from a desire to get rid of deceased, an important witness for the wife, as an obstacle to his success, statements made by him to a witness, that "he was tired of his wife, and intended to get a divorce from her," and requesting permission to marry the daughter of the witness, are competent to show motive and were properly admitted in evidence.

11. *Same; proof of in this case.*—In such a case the jury could not consider the merits of the divorce suit, but only the fact of its pendency and the motive of its prosecution.

12. *Threats against deceased made by accomplice; when admissible.*—Where an accomplice testified that he killed the deceased at the instigation of the defendant, evidence of threats made by such accomplice against the deceased, because the latter was talking about his sister, tend to show that the slayer acted from personal malice without reference to the defendant, and is admissible.

13. *A charge invading province of jury properly refused.*—A charge which assumes the right of the court to direct the jury, that they "must" look to certain facts, as evidence, to influence their verdict, invades the province of the jury, and is properly refused.

APPEAL from Crenshaw Circuit Court.

Tried before Hon. J. K. HENRY.

At the Spring term, 1879, of the Circuit Court of Crenshaw county, James Thomas Marler, and Andrew Napoleon (*alias* "Bose") Redman, were indicted for the murder of William B. Colquitt. Before the trial of the case, Redman was pronounced insane, by a jury empanneled by the order of the court, to try the question of his sanity, and the court adjudged him insane, and ordered him confined in jail until he could be sent to the State Insane Hospital at Tuscaloosa; that on his return to sanity, he should be remanded to the jail of Crenshaw county for trial, and that his trial be postponed until that time. Marler was arraigned and pleaded "not guilty," and was tried alone. W. B. Colquitt, a practicing physician, having a sick patient at his house, took a lamp about eight o'clock, on the night of August 16th, 1878, to get some medicines which he kept in his medicine chest in his buggy, which was then under a shelter in his horse-lot, and while there was shot and killed by Redman, the defend-

ant. The defendant, Marler, had filed a bill against his wife for divorce which had been answered, and on July 18th, 1878, direct interrogatories were filed, on behalf of his wife, and were propounded to Dr. Colquitt and ten or twelve other persons. Cross interrogatories were filed August 12, 1878, and a commission issued on the same day to take testimony. Marler, in a conversation with the commissioner, objected to the time and place of taking the testimony, and got him to change the place of taking it to one Davis', and the time of taking it to the Thursday or Friday after Dr. Colquitt was killed. The bill, the answer of the wife, and the interrogatories, were introduced in evidence by the State. Thomas Holmes testified, that about two weeks before Dr. Colquitt was killed, he heard Marler say that he would get a divorce from his wife; that there was but one thing in the way, and that was Dr. Colquitt, but that he would put him out of the way or have it done. On cross-examination, he was asked by the defendant, if he did not hear Dr. Colquitt a short time before his death, make remarks in a public manner, derogatory to the character of Redman's sister. The State objected to this question, the court sustained the objection and defendant excepted. Jacob Redman, the father of "Bose" Redman, testified that about two months before Dr. Colquitt was killed, defendant Marler stated to him, that he was tired of his wife, and intended to get a divorce from her, and that he wanted his, (Redman's), permission to marry his daughter, which witness told him he could not do. The defendant objected to the introduction of this evidence, but the court overruled the objection, and defendant excepted. Mr. Gilchrist testified that defendant told him that he wanted to get a divorce from his wife, and asked witness to fix up for him some deeds to land, but witness asked him to get Mr. Stallings or Dr. Colquitt to do it, and then defendant said, that Dr. Colquitt was attending to his business, and if he did not stop it he would make him do it. In another conversation, he stated to witness that "his wife was a lewd woman, and he intended to have a divorce from her." Witness said to him that "his wife was a good woman, and if he didn't mind they would get him in jail;" defendant replied that "some of them were going to swear in the case, and he would get them in jail." The original papers in the proceedings before the committing magistrate were introduced in evidence against the objection of defendant, and to the introduction of which, the defendant excepted. The magistrate testified, that Marler was tried before him separately and not with his co-defendant Redman. The State also introduced in evidence the judgment of the Circuit Court of Crenshaw county ad-

[Marler v. The State.]

judging said Redman to be insane, the substance of which has already been stated. The defendant objected to the introduction of the evidence, but the court overruled the objection, and defendant excepted. Redman had testified as a witness, on the preliminary trial of the defendant, Marler, before a committing magistrate, but his testimony was not reduced to writing, and the State introduced W. D. Roberts, Esq., to prove what Redman had sworn at said trial. The defendant objected to Roberts so testifying, but the court overruled the objection, and defendant excepted. The substance of Redman's testimony, as given by the witness Roberts, was that he, Redman, had killed Dr. Colquitt; that Marler had hired him to do so ; that the agreement was made on Monday before the Friday on which the killing occurred ; that Marler agreed to give him fifty dollars, gather his crop for him, carry him to his (Marler's) sister, and assist him with rations if he was discovered in the killing ; that he stood at the gate of Dr. Colquitt's lot, who was standing by his buggy, with a lamp in his hand, and when he turned around he shot him. Marler was to take his wagon, and go to George Leverett's, so that if suspected he could prove that he was not where the killing took place ; that he then went to the house of Marler's father, found the room arranged as Marler had told him it would be fixed, and awoke Catherine Marler, defendant's sister, and told her he had killed Dr. Colquitt, and she replied, "I am sorry you did it," and called her mother and informed her what he, Redman, had done ; that Mrs. Marler told him to go away, and he did so ; that he killed Dr. Colquitt for the love he had for Catherine Marler; that Marler said the reason he wanted Dr. Colquitt killed, was because he was going to swear his happiness and life away; that he only stayed two or three minutes at Mrs. Marler's. Defendant moved to exclude this evidence from the jury, but the court overruled the motion and defendant excepted. Catherine Marler testified that Redman came to her window, the night Dr. Colquitt was killed, had a short conversation with her, and her mother, and told her he had killed Dr. Colquitt. George Leverett, an uncle of the defendant, testified that Marler arrived at his house about 8 o'clock on the Friday evening when Dr. Colquitt was killed. Cole Redman, a brother of "Bose Redman," testified, that defendant offered him $100, on the morning he was committed, to swear that he, Marler, and his brother, "Bose" Redman, had had a difficulty; that this was untrue, and he refused to swear it.

The defendant introduced Mrs. Marler, who testified that she went with Redman from her house to his father's on the

Friday previous to the killing, that she returned with Red-
man on the next Monday; that he stopped at his house and
witness went on home, where she found defendant. She was
then asked why she made the trip with Redman to his
father's. The State objected to this question, the court
sustained the objection, and defendant excepted. She
was then asked if she heard Redman say anything about
Dr. Colquitt during that trip, but the State objected to
the question, the court sustained the objection, and
defendant excepted. She was then asked, if, on said
trip, she heard Redman make any threats against said Col-
quitt. The State objected to the question, the court sus-
tained the objection, and defendant excepted. The defend-
ant announced to the court before the two preceding ex-
ceptions were reserved, that he proposed to prove by said
witness, that the said Redman had threatened the life of Dr.
Colquitt for talking about his sister. She also testified, that
on the evening of the day she returned with Redman from
his father's, Redman, his wife and her sister came to her
house, and returned when the sun was about a half hour high.
Defendant asked her, "what reason they gave for returning."
The State objected to this question, the court sustained the
objection, and defendant excepted. The court charged the
jury, "that it is not necessary to authorize a conviction for
felony on the testimony of an accomplice, that his evidence
should be corroborated by other evidence, in every material
point, but it is sufficient if it be so confirmed, as to convince
the jury, that it is correct and true. The defendant excepted
to the giving of this charge. The defendant then asked the
court to give the following written charges to the jury; all
of which the court refused to give, and the defendant sepa-
rately excepted to each refusal. 1. The jury have nothing
to do with the merits of the divorce suit, and the fact that
the defendant failed to deny to Gilchrist that his wife was a
good woman, is not a circumstance to be considered by the
jury in passing upon the guilt or innocence of defendant.
2. That there can be no conspiracy to do an unlawful act,
without a positive agreement between two or more parties to
do such act, and that unless, outside and independent of the
testimony of said "Bose Redman," the evidence shows such
agreement on the part of defendant to do such act, they must
acquit the defendant. 3. That if the jury have a reasonable
doubt, as to whether or not, the evidence outside of the said
Redman's testimony shows a community of purpose between
the said Redman, and the defendant, they must acquit the
defendant. 4. That if the jury have a reasonable doubt,
whether the evidence outside of the testimony of said Red-

man, shows a conspiracy, or agreement between said Red-man and the defendant, to take the life of the deceased, they must acquit the defendant. 5. The jury have nothing to do with the declaration of the defendant, that he was tired of his wife, except in so far as it may tend to show that he wanted a divorce. 6. They must also look to the fact, if it be true, that he is contradicted as to some of the material facts contained in his statement, and that there is a want of corroboration as to some others, if such want of corrobora-tion in fact exist, and the evidence of such corroboration is reasonably attainable. 7. The jury need not necessarily in-fer that defendant is guilty, although he may have offered Cole Redman $100 to swear falsely, if they believe that he was influenced by the fear of being unjustly convicted. The defendant was convicted and sentenced to imprisonment for life.

J. D. GARDNER, for appellant.—The court erred in admit-ting the evidence of Roberts, as to what Redman swore on the preliminary examination. Such testimony is inadmissi-ble except where the witness is dead.—*Dupree v. The State*, 33 Ala. 380; *Tharp v. The State*, 15 Ala. 749, citing 5 Ran. 701, 5 Hill (N. Y.) 295. But Redman being jointly indicted with appellant was disqualified as a witness. The testimony of Redman's father was irrelevant and ought to have been excluded. The defense should have been permitted to prove the threats made by Redman against Colquitt. The testi-mony which convicted defendant was purely circumstantial. Many other questions are presented, but not argued, as it is thought unnecessary.

. H. C. TOMPKINS, Attorney-General, for the State.—The evidence of Jacob Redman was admissible to show the mo-tive for killing Dr. Colquitt. Appellant had filed a bill seeking a divorce from his wife, and testimony which would show that he wished to marry another woman, would be the strongest kind of evidence, to prove a desire to get rid of his wife. Any proof tending to show this desire was admissible and would tend to show a reason for appellant's antagonism to Dr. Colquitt, whose testimony and exertions seem to have been an insuperable obstacle in his way. Proof of a desire to get rid of his wife was certainly admissible, and the fact that he wished to do so to marry another woman, is even stronger evidence, for if he had simply desired to get rid of an unworthy wife, the efforts of her friends to prevent him from doing so, would not in all probability have excited in him that malicious feeling which prompts murder ; but if the

[Marler v. The State ]

desire to get rid of his wife originated in those lustful passions, which are against the law of God and man, the jury might infer that the same yielding to criminal passion had planned the assassination of Dr. Colquitt, especially when yielding to one seemed to furnish the means of gratifying the other. The judgment of the court pronouncing Redman insane, and the subsequent arraignment and trial of defendant worked a severance of their cases, and Redman was a competent witness against Marler.—1 Wh. Am. Cr. Law, 783. When a witness who has testified on a former trial has died, become insane, or physically disabled, his former testimony may be proven on a subsequent trial, in criminal, as well as in civil cases.—2 G. & J. 54; 6 C. &. P. 116; 4 Eng. C. L. 145; Ib. 147; 1 Wh. on Ev. 179; 17 Ala. 354; 1 Gr. on Ev. 163; 1 Starkie on Ev. 262. Roberts' evidence was sufficiently full.—17 Ala. 354; 17 Vt. 658; 10 Humph. 479. The other exceptions to evidence do not present questions which will authorize this court to reverse.—47 Ala. 370; 63 Ala. 178. The charge of the court was most favorable to the defendant, in requiring the jury to believe that all of Redman's testimony was true, which was unnecessary. It is only necessary that the testimony of an accomplice should be corroborated by evidence tending to connect defendant with the commission of the offense.—Code of 1876, § 4395; 40 Ala. 634. These authorities show the incorrectness of the third and fourth charges. The second charge was wrong in requiring proof of a positive agreement of conspiracy. 1 Brick. Dig. p. 451, § 53. The 6th. charge is meaningless. The 7th charge would have required explanation. It was the duty of the jury to look at the whole evidence, and the remark referred to in the first charge, was part of a conversation and could not be withdrawn from them.

SOMERVILLE, J.—The main question presented for our consideration in this case, is the admissibility of the witness Roberts' testimony as to what one Redman had previously sworn on the preliminary investigation before the committing magistrate. Redman had there testified for the State, under the sanction of an oath, subject to a full cross-examination by the defendant. Before the trial in the Circuit Court, in which he was jointly indicted with the appellant, Marler, he became insane, and was so pronounced by the verdict of a jury and the judgment of the court, after which a severance of the case was granted. The court admitted the substance of Redman's testimony, as given before the magistrate, to be proved, to which an exception was taken, and this ruling of the Circuit Judge is assigned as error.

[Marler v. The State.]

The general rules of evidence at common law, subject to few exceptions, are the same in civil and criminal cases, being more liberal, at least in some instances, in the latter than the former. Dying declarations, for example, are never admissible in civil cases, but only in charges of homicide. It is manifest, indeed, that the danger of perjury is not usually so great in matters of crime, which government and society are chiefly interested in punishing, as in those cases involving large pecuniary interests, as the experience of mankind has taught in all countries where nuncupative wills have been allowed.—2 Best Ev. § 505.

.It is now established beyond disputation that, where a witness has testified under oath, in a judicial proceeding, in which an adverse litigant was a party, and was subject to cross-examination, the testimony so given is admissible, after the *decease* of the witness, in any subsequent suit between the same parties.—1 Greenl. Ev. 163; 2 Best Ev. § 496; 1 Phil. Ev. (C. H. & E.) 389, *note ;* 2 Russ. Cr. 683. And in *Horton v. State,* 53 Ala. 488, this principle was declared "applicable alike to civil and criminal cases," and this court, on the strength of it, sustained the admission of the testimony of a deceased witness, taken down by a committing magistrate on preliminary investigation, when introduced on trial under indictment in the Circuit Court.

Such testimony is not liable to the objections ordinarily urged against hearsay or derivative evidence, for it was delivered under the sanction of an oath, and the adverse party has had, or might have had, the full benefit of a cross-examination.—1 Stark. Ev. 42. It is, therefore, admitted rather upon the principle of necessity, than of expediency, so as to prevent the defeat of the ends of justice "The admission of such evidence," says Mr. Wharton, "is based upon the fact that the party against whom the evidence is offered, having had the power to cross-examine at the former trial, and the parties and issues being the same, the second suit is virtually *a continuation of the first.*"—Law of Ev. § 177.

We are of opinion that the reason of the rule applies, with unanswerable force, to all cases where the witness has become *insane.* As said by Lord Kenyon, in *Rex v. Eriswell,* 2 Durnf. & E. 386 (3 T. R. 707), he is, to all intents and purposes, to be considered "in the same state as if he were *dead.*" And though the question was left undecided in that case, Buller, J., concurring with Lord Kenyon, regarded the party "as dead, he being in such a state as to render it impossible to examine him."—*Ib.* 391.

A case, however, clearly in point is that of *Regina v. Marshall,* Car. & Mar. Rep. 147. It was there held that where a
VOL. LXVII.

[Marler v. The State.]

witness was *actually* insane at the time of the trial on indict-
ment, his deposition, taken before the committing magistrate,
could be read the same as if he were *dead*, although the
insanity be but temporary; but not where the witness was
suffering from delirium through injuries produced by a blow
on the head, if his physician was of opinion he would re-
cover. In *Rex v. Hogg*, 6 Car. & P. 176, where a prosecutor,
in a case of felony, was bed-ridden, and there was no proba-
bility that she would ever be able to leave her home, her
deposition taken before the magistrate was held admissible
in the same manner as if she were dead. In the Earl of
Strafford's case it was adjudged, "that where witnesses could
not be procured to testify *viva voce*, by reason of sickness,
&c., then their depositions might be read, for or against the
prisoner, but not when they might have been produced in
person."—2 Hawk. Pl. Cr. ch. 46, s. 20.

There seems to be no difference of opinion on this ques-
tion among the best text-writers. Mr. Greenleaf asserts that
such evidence is admissible, "if the witness, though not dead,
is out of the jurisdiction, or cannot be found after diligent
search, or is *insane*, or sick and unable to testify, or has been
summoned, but appears to have been kept away by the ad-
verse party." Mr. Wharton takes the same view, thinking the
rule applies "when, from the nature of the illness or infirm-
ity, no reasonable hope remains that the witness will be able
to appear in court on any future occasion," and he adds:
"*Mental incapacity*, from whatever cause, is a sufficient in-
ducement. It has been said, that if the insanity is tempo-
rary, the true course is to continue the case until the witness
recovers; but the contrary view has been expressed by an
English court, and there are some classes of cases (*e. g.* crim-
inal of high grade) in which such a continuance cannot in
law be granted, and others in which the inconveniences would
be so great as to amount to an obstruction of justice."

The annotator of Phillips on Evidence approves the appli-
cation of the principle in question to cases where the witness
has become insane, and others of like character, and arrives
at the conclusion that "those [cases] which have come near-
est to the liberal principle on which secondary evidence is
generally received, are less anomalous, and therefore more
scientific than the narrower decisions."—1 Phil. Ev. (C. & H.
and E.'s notes), 393.

Mr. Justice Cheves, in *Drayton v. Wells*, 1 Nott and McCord,
409, says: "The books enumerate four cases only in which
the testimony of a witness, who has been examined in a for-
mer trial, between the same parties, and where the point in
issue is the same, may be given in evidence, on a second

[Marler v. The State.]

trial, from the mouths of other witnesses, who heard him give evidence : 1st. When the witness is *dead* ; 2nd. Where he is *insane* ; 3rd. Where he is beyond seas ; 4th. Where the court was satisfied that the *witness had been kept away* by the contrivance of the opposite party."

In *Ernig v. Diehl*, 76 Penn. St. 359, the rule as enunciated by Mr. Greenleaf is endorsed by Sharswood, J., and was applied to one in such a state of *senility* as to have lost his memory, all of the seven judges concurring on this particular point.

In *Rogers v. Raborg*, 2 Gill and J. 54, the Supreme Court of Maryland admitted the deposition of a *paralytic*, who, though regularly summoned as a witness, was unable to leave his home, or speak so as to be understood. The court declared the evidence admissible on the ground of necessity, the witness being the same as if he were dead.

The courts of Louisiana have gone so far as to admit such testimony in the case of the *temporary sickness* of a witness. In *Miller v. Russell*, 7 Mart. Rep. 266, where a witness had been examined and notes of his testimony carefully taken, the court said : '' To have examined him again, laboring under disease, would have afforded no better evidence, perhaps not so clear, as that which had been obtained from him on the former trial." But as Lord Ellenborough suggested in *Harrison v. Blades*, 3 Camp. 458, in such cases, it should appear that the sickness is of a character imposing permanent inability, as, otherwise, there would be very many sudden indispositions and recoveries.

In *Kendrick v. State*, 10 Hump. 479, the Supreme Court of Tennessee indorsed the principle admitting the testimony of a deceased witness given in a former trial, and declared the maintenance of the rule, in criminal cases, to be of far greater importance to the lives and liberty of defendants than of mere justice to the State.

This court, in *Long v. Davis*, 18 Ala. 801, admitted the deposition of a witness, taken in a former suit, after his *removal from the State*, in a subsequent suit between the parties. CHILTON, J. said : " We think the more liberal doctrine which allows a permanent absence from the jurisdiction as an excuse, is more consonant with the legal analogies, and is sustained by the preponderance of authority."

It has been held by some of the courts, including those of New York and Virginia, that no evidence of this character, save that only of *deceased* witnesses, is admissible in criminal cases, but this view, we believe, is opposed to both the weight of reason and the preponderance of authority. Whether originating in necessity or based on expediency, the purpose

[Marler v. The State.]

of the rule is to prevent the defeat of justice ; and tested by this principle, there is no real or practical difference between the *death of the mind* and the death of the body. If a man's reason be utterly dethroned, it were all one, in the eye of the law, so far as regards his capacity to testify, that his body were in the grave.

It is very clear that such evidence is no more a violation of the constitutional right of every citizen to be confronted by his witnesses, than the admission of dying declarations, and in fact, much less so, as the defendant has once exercised this right, and had an opportunity to elicit the truth by cross-examination.—*Kendrick v. State,* 10 Hump. 479 ; *Com. v. Richards,* 18 Pick. R. 437 ; *Green v. State,* M. S. Dec. T. 1880.

And while some of the cases follow the old rule first suggested, we believe, by a *dictum* of Lord Kenyon (4 T. R. 290), that the very language of the witness—*ipsissimis verbis*—must be given, the well settled opinion now obtains that the precise words need not be repeated on the second trial, but only the substance of the testimony given in the former trial. 1 Greenl. § 165 ; Wharton Am. Cr. L. § 667 ; *State v. Hook,* 17 Vt. 659 ; *Kendrick v. State,* 10 Hump. 479.

The rulings of the Circuit Court were without error in admitting the secondary testimony, given by Roberts, as to what Redman had testified before the committing magistrate.

The record proceedings establishing the insanity of Redman were designed under the statute to be *pro hac vice* merely. They were improperly admitted in evidence in this case, as defendant was no party to them, nor in any manner bound by them. They were entirely unlike an ordinary inquisition of lunacy, which is analagous to a proceeding *in rem.* being made on behalf of the public, so that no one can strictly be said to be a stranger to it.—1 Greenl. Ev. 556 ; Code (1876), § 1488. The insanity of Redman could be proved by any competent evidence satisfactory to the mind of the court.

The action of the Circuit Court created a severance in the cases of the two defendants, who were jointly indicted, and either was then a competent witness for or against the other. Code, (1876), § 4892 ; Clark's Man. Cr. L. § 2402 ; Whart. Cr. Ev. § 439.

There was no error in excluding the question propounded to the witness Holmes, whether he had not heard deceased make remarks derogatory to the character of Redman's sister. It was clearly irrelevant, unless shown to have been communicated to Redman, as a motive to the homicide other than the one upon which the theory of the prosecution was based. Nor is it made to appear what was the pertinency of the interrogatory propounded to Mrs. Marler, asking " what

(5)

reason " Redman, and his wife and sister, gave for returning from his father's.

The Circuit Court erred, however, in giving the charge to which exception was taken. In order to authorize the conviction of a defendant for felony on the testimony of an accomplice, it is true that his testimony need not be corroborated in every particular. But it is not sufficient if it merely be so confirmed as to convince the jury it is true. It must be " corroborated by other evidence tending to connect the defendant with the commission of the offense." The statute does not permit a jury to be convinced by any other kind of corroboration.—Code (1876), § 4895 ; Smith v. State, 59 Ala. 104.

It was error, also, to exclude the evidence that Redman had made threats against the deceased for talking about his sister. This would tend to prove that his conduct in killing deceased was dictated by his own personal malice, independently of the instigation of the appellant, Marler, and to this extent suggested a possible hypothesis inconsistent with his own statement.

The first charge requested by the appellant, and refused by the court, should have been given. The jury had no right to consider the merits of the divorce suit, but only the fact of its pendency and the motive of its prosecution. Nor did defendant's failure to deny to Gilchrist that " his wife was a good woman " affect the question of his guilt or innocence.

A conspiracy to commit a crime can be established as well by circumstantial as by direct evidence. It is not necessary to prove a " positive agreement," as asserted by the second charge, nor to establish it " outside and independent " of the testimony of an accomplice. If the testimony of the accomplice is satisfactorily corroborated so far as his statement connects the defendant with the commission of the offense, it is a sufficient conformity to the statute. The second, third and fourth charges were properly refused.

The State was permitted to prove by Jacob Redman, against objection, the fact that the prisoner, Marler, stated to him that " he was tired of his wife, and intended to get a divorce from her, and he [Marler] wanted his [Redman's] permission to marry his daughter." This was competent, we think, to prove motive. The deceased, Dr. Colquitt, was an important witness in the divorce suit instituted by Marler against his wife. The evidence tended to show that Marler's imputed purpose, in his alleged complicity in the killing, was to get rid of deceased as an obstacle to his success in obtaining such divorce. This motive, if in fact it existed, was material to strengthen the probability of his guilt. If he

[Ingram v. The State.]

wished to marry Redman's daughter, this might intensify the desire for a divorce, and this again tend to quicken eagerness to destroy the witness. For this reason the evidence in question was admissible, and the fifth charge requested by appellant was properly refused.

The sixth charge invaded the province of the jury, in assuming the right of the court to charge the jury that they "must" look to certain facts, as evidence to influence their verdict; and the seventh was not supported by the evidence, and being abstract, it was not error to refuse it.

There are several other minor exceptions to the admission of evidence, not necessary to be noticed, as they are not likely to arise again in a new trial.

The judgment of the Circuit Court is reversed and the case remanded. And, in the mean while, let the prisoner be retained in custody until discharged by due course of law.