STATE OF IOWA v. GRANT BROWN, Appellant.

**Criminal law:** MURDER: EVIDENCE. On this prosecution for murder
1 the evidence is reviewed and while conflicting is held sufficient
to support conviction for murder in the second degree.

**Same:** EVIDENCE: RIGHT TO BE CONFRONTED WITH WITNESSES: CONSTI-
2 TUTIONAL LAW. The testimony of a witness taken upon the first
trial of a cause may be read upon the second trial by the official
reporter, as provided by Code Supp., section 245-a, where the wit-
ness is beyond the reach of a subpoena; and the same is not in
violation of the constitution which accords to all persons in
criminal prosecutions the right to be confronted with the wit-
nesses against them.

**Same:** MANSLAUGHTER: WHEN NOT AN INCLUDED OFFENSE. The crime
3 of murder involves the element of malice, while that element
is not essential to the crime of manslaughter, and for that reason

the latter is regarded as a distinct crime and not a mere degree of the higher offense, though included therein: So that where the killing of a human being is accomplished by the use of a weapon calculated to produce death the presumption that the act was done in malice arises; and where there is no evidence to rebut this presumption the crime of manslaughter is not involved, and the question of defendant's guilt of the lesser offense need not be submitted as an included offense.

Weaver, J., dissenting.

*Appeal from Mahaska District Court.*—HON. JOHN F. TALBOT, Judge.

THURSDAY, OCTOBER 19, 1911.

THE defendant appeals from a conviction of murder in the second degree. *Affirmed.*

*Frank·T. Nash,* for appellant.

*George Cosson,* Attorney-General, and *J. G. Patterson,* County Attorney, and *Jas. A. Devilt,* for the State.

LADD, J.—I. At about 11 o'clock p. m. of September 19, 1910, Charles Barrett was killed by someone. Appellant contends that the evidence fails to identify him as the guilty person. Elizabeth Barrett, from whom deceased had been divorced several years, and a sister of defendant, with their three children, resided in a house on West Eighth street, in Oskaloosa. On the opposite side, and the width of a lot to the east, lived her parents. The defendant made his home with them, as did his son and wife. It was the latter's birthday, and members of the family with some neighbors gathered in the evening to enjoy with her the gift of a piano from her husband. Mrs. Barrett came at about 8 o'clock, having left her daughter Maud, about fifteen years of age, at home. While there, deceased brought

1. CRIMINAL LAW: murder: evidence.

Maud some bread and bananas, and talked with her, and
according to her story she soon went to her grandfather's
house, where she related, in the presence of defendant,
what had occurred, and to which the latter remarked, in
response, deceased had no business coming there. She also
swore that in the afternoon she had seen defendant con-
ceal a revolver in his shirt, and previously had heard him
threaten to take her father's life. Charles, a son of Bar-
rett, twenty-four years of age, testified to having heard
defendant say that deceased "must not fool around on
Eighth avenue, because if he does I will get him." Sam-
uel Barrett, another son, about eighteen years of age, re-
turned from down town between 9 and 10 o'clock, stopped
at his grandfather's house until about 11 o'clock, when
he and his mother departed for home. He testified that,
though defendant was with his grandfather when they left,
he observed him come to the lawn just as he and his
mother had reached the porch, and pass along the east
side of the house toward a corn patch south of it; that
witness first went through the kitchen to an outside closet,
and noticed defendant in the alley back of the coalhouse;
that upon returning to the kitchen he ate a lunch, and as
he started for the porch in front heard three shots fired
in the rear of the house, and, upon reaching the porch,
saw his father run past the porch into the road, and fall.
This witness also testified to having heard defendant
threaten the life of deceased. There was an alley imme-
diately west of Mrs. Barrett's home, running north and
south. On that day Shinofield had moved into a house
set back near this alley on a lot fronting west on F.
street, and cornering that on which Mrs. Barrett's coal
shed was located. He and his wife, Elizabeth, were occu-
pying the southeast bedroom in the upper story, and had
their horse and bulldog tied in a tent about ten feet from
the alley. She was awakened by the barking of the dog,
as though at someone, and heard the three shots, and im-

mediately thereafter heard footsteps of someone passing, and, upon looking out the window, saw a man dressed in dark clothes walking rapidly in a southerly direction along the alley, with his hand doing something at his hip pocket. Mrs. Risney and husband lived at the northeast corner of the block diagonally across from the southwest corner of that on which the Barrett house was located, so that in passing out of the alley at the south one might turn west on Avenue Nine West, over the Iowa Central Railway, past their residence. She had returned from the opera house at about 11 o'clock, and testified that, while standing in the front door, she heard the dog bark and the three shots fired, walked out on the porch, and a moment later saw a man dressed in dark clothes come out of the alley and walk west along Avenue Nine West past where she was standing, and within ten or fifteen feet of her; that he reached for his hip pocket, and started toward her when she ran into the house; that she had known defendant about fifteen years, and that he was the person she then saw.

Blood stains were traced from near the southwest corner of the house to where deceased fell. He was lying on a broomstick, with a stone near his right hand. A bullet had passed into his body back of the shoulder blade and severed the aorta, and another had struck the house near the corner. East of the coal shed, back of the house, were several rows of corn, and south of the corn a tomato patch. Tracks of someone who had stood back of this corn were discovered at about 7 o'clock the next morning, some seventy-five feet southeast of the first trace of blood near the corner of the house. The defendant when arrested wore slippers, and these fitted the tracks mentioned and those of a person who had passed south in the alley and west on Avenue Nine West, over the railway, as described by Mrs. Shinofield and Mrs. Risney, onto the next street east (H. street), then along it north to the rail-

way, and then southeast along it to F. street, north on F. street, and east along the alley, passing the rear of the house where defendant lived. A witness testified to observing a person enter this house about the time one might have reached it after making the circuit indicated by the tracks, and McCord to having seen defendant at an alley near the intersection of Avenue Eight West and D. street (east of defendant's home) at about 12 o'clock, and walk toward home with his father, who had been walking with McCord. It should be added that there was evidence tending to contradict that of the threats, to show that Mrs. Risney had made statements out of court differing from her testimony, and that she had not done so; that a revolver was not in defendant's possession, as related by Maud Barrett; that defendant's son wore the slippers during the time in question, and defendant was barefooted, and the reverse; that Maud did not tell, in defendant's presence, of seeing her father at Mrs. Barrett's house, and that defendant was at his parent's house in bed when the shooting occurred. The witnesses all agreed that defendant was not at the scene of the tragedy after it happened, and that the moon was shining brightly. Such is the outline of the evidence. That introduced by the state points unerringly, as the jury might have found, to the defendant as the perpetrator of the offense. Someone, other than deceased, was in the rear of Mrs. Barrett's house. The testimony of Samuel Barrett that defendant was that person is strongly corroborated by that of Mrs. Shinofield and Mrs. Risney, and the footprints which corresponded with defendant's slippers.

The credibility of the witnesses was for the jury to pass on, and, moreover, if defendant and deceased were on friendly terms, as the defense undertook to prove, it is scarcely conceivable that he could have remained at home away from the scene of the tragedy. The jury might have concluded that he was at enmity with deceased, be-

cause he believed the latter had encouraged his prosecution
for another offense (see *State v. Brown,* 146 Iowa, 113),
that he had repeatedly threatened his life, had armed him-
self with a deadly weapon, and, with knowledge that de-
ceased was about Mrs. Barrett's house, had gone there for
the purpose of executing his threats, and did so.    The
verdict has ample support in the evidence.

II.    At a former trial of this cause, one Valentine
had testified that as sheriff of the county he had received
the accused into custody, and at that time he wore the
slippers mentioned.    The state introduced

2. SAME: evi-
dence: right
to be con-
fronted with
witnesses: con-
stitutional law.

evidence on this trial, showing that Valen-
tine could not be served with a subpoena,
and was at Hot Springs, Ark.    Thereupon
the official reporter was allowed to read the
testimony of the witness, as given at the former trial, from
his shorthand notes then taken and properly preserved.
This was authorized by section 245-a, Code Supp., but it
is contended that it was in violation of that portion of
section 10, article 1, of the Constitution of Iowa, which
accords to persons in all criminal prosecutions and cases
involving the life or liberty of the individual the right to
be "confronted with the witnesses against him."    The cur-
rent of authority is that the testimony of a witness who
has since died, given in a preliminary hearing or in a
former trial, may be given in evidence without violating
this provision of the Constitution, and this court has so
held. *State v. Fitzgerald,* 63 Iowa, 268; *State v. O'Brien,*
81 Iowa, 88; *State v. Kimes,* 152 Iowa, 240.    The
grounds on which courts reach this conclusion differ some-
what.    Some argue that the construction is necessary to
avoid the failure of justice, *Marler v. State,* 67 Ala. 55
(42 Am. Rep. 95), others that the constitutional provi-
sion is but declaratory of the common law, under which
the practice was allowed, *State v. McO'Blenis,* 24 Mo.
402 (69 Am. Dec. 435), and still others that the require-

ment of the Constitution has been met by being confronted by the witness, having had an opportunity to cross-examine at the preliminary hearing or former trial.

Prof. Wigmore, after reviewing the history of the hearsay rule and of the right to cross-examine, concludes that: "Confrontation is, in its main aspect, merely another term for the test of cross-examination. It is the preliminary step to securing the opportunity of cross-examination; and, so far as it is essential, this is only because cross-examination is essential. The right of confrontation is the right to the opportunity of cross-examination. Confrontation also involves a subordinate and incidental advantage, namely, the observation by the tribunal of the witness' demeanor on the stand as a minor means of judging of the value of his testimony. But this minor advantage is not .regarded as essential, *i. e.,* it may be dispensed with when it is not feasible." 2 Wigmore, Ev. section 1365. This secondary advantage may also include a certain subjective moral effect on the witness, and, as said by the author, "is to be insisted upon whenever it can be had. No one has doubted that it is highly desirable, if only it is available. But it is merely desirable. Where it can not be obtained, it need not be required. It is no essential part of the notion of confrontation; it stands on no better footing than other evidence to which special value is attached; and just as the original of a document or a preferred witness may be dispensed with in case of unavailability, so demeanor evidence may be dispensed with in a similar necessity. Accordingly, supposing that the indispensable requirement of cross-examination has been satisfied, the only remaining inquiry is whether the demeanor evidence, to be obtained by the witness' production before the tribunal, is available."

In *Mattox v. U. S.,* 156 U. S. 237 (15 Sup. Ct. 337, 39 L. Ed. 409), Mr. Justice Brown, after reviewing the decisions of several of the state courts, tersely summarizes

the reasons for so construing the constitutional provision as not to exclude the testimony of a witness since deceased:

The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury, in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. There is doubtless reason for saying the accused should never lose the benefit of any of these safeguards, even by the death of the witness, and that, if notes of his testimony are to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot-free, simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law in its wisdom declares that the rights of the public shall not be wholly sacrificed, in order that an incidental benefit may be preserved to the accused.

We are bound to interpret the Constitution in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject—such as his ancestors had inherited and defended since the days of Magna Charta. Many of its provisions in the nature of a bill of rights are subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected. A technical adherence to the letter of a constitutional provision may occasionally be carried farther than is necessary to the just protection of

the accused, and farther than the safety of the public will warrant. For instance, there could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations. They are rarely made in the presence of the accused; they are made without any opportunity for examination or cross-examination, nor is the witness brought face to face with the jury; yet from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility. They are admitted, not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice. As was said by the Chief Justice, when this case was here upon the first writ of error (146 U. S. 140, 152 (13 Sup. Ct. 50), 36 L. Ed. 917, 921), the sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath. If such declarations are admitted, because made by a person then dead, under circumstances which give his statements the same weight under oath, there is equal, if not greater, reason for admitting testimony of his statements which were made under oath.

The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of, and many of the very cases which hold testimony such as this to be admissible also hold that, not the substance of his testimony only, but the very words of the witness, shall be proven. We do not wish to be understood as expressing an opinion upon this point, but all the authorities hold that a copy of the stenographic report of his entire former testimony, supported by the oath of the stenographer that it is a correct transcript of his notes, and of the testimony of deceased witness, such as was produced in this case, is competent evidence of what he said.

It is obvious that this reasoning is quite as forceful and as applicable in a case where the witness is out of the

state, and therefore beyond the reach of a subpoena. The state is quite as helpless in procuring his attendance as though he were dead or beyond the sea, and the defendant has had precisely the same advantage in the way of confrontation. This was conceded in *Cline v. State,* 36 Tex. Cr. R. 320 (36 S. W. 1099, 37 S. W. 722, 61 Am. St. Rep. 850), since overruled by *Porch v. State,* 51 Tex. Cr. R. 7, 99 S. W. 1122, in which the entire doctrine was repudiated. In *State v. King,* 24 Utah, 482 (68 Pac. 418, 91 Am. St. Rep. 808), the court in concluding said: "The death of the witness has always and as of course been considered as sufficient to allow the use of former testimony. The absence of the witness from the jurisdiction, out of reach of the court's process, ought also to be sufficient, and is so treated by the great majority of courts. Mere absence, however, may not be sufficient, and it is usually said that a residence or an absence for a prolonged or uncertain time is necessary. A few courts do not recognize at all this cause for nonproduction; a few deny it for criminal cases. Neither position is sound. Inability to find the witness is an equally sufficient reason for nonproduction by the better opinion, though there are contrary precedents. The sufficiency of the search is usually and properly left to the trial court's discretion." In *State v. Nelson,* 68 Kan. 566 (75 Pac. 505), the court, after reviewing the authorities, concluded that "the only reasoning that justly sustains the use of former testimony of a witness who has since died applies with equal force where the witness is out of the jurisdiction of the court, and so can not be produced." The tendency of all the more recent decisions is in the same direction. *State v. Heffernan,* 22 S. D. 513 (118 N. W. 1027, 25 L. R. A. (N. S.) 868), and valuable note; *Knight v. State,* 103 Ala. 48 (16 South. 7); *State v. Stewart,* 34 La. Ann. 1037; *People v. Elliott,* 172 N. Y. 146 (64 N. E. 837, 60 L. R. A. 318); *Sneed v. State,* 47 Ark. 180 (1 S. W. 68). See,

*contra, Pittman v. State,* 92 Ga. 480 (17 S. E. 856); *State v. Houser,* 26 Mo. 431; *Hall v. State,* 6 Baxt. (Tenn.) 522; *Finn v. Commonwealth,* 5 Rand. (Va.) 701. We are of the opinion that there was no error in permitting the testimony of Valentine at the former trial to be read to the jury.

III. Exception is taken to the court's charge, in that the issue as to whether defendant was guilty of manslaughter was not submitted to the jury. That death resulted from the shooting was not in dispute, so that it was unnecessary to submit the included offenses, less than that of manslaughter. *State v. Sterrett,* 80 Iowa, 609; *State v. Perigo,* 80 Iowa, 37. And it would not have been reversible error to have submitted that. *State v. Shepherd,* 129 Iowa, 705; *State v. Wood,* 112 Iowa, 411. See *State v. Hayden,* 131 Iowa, 1. But, where there is no evidence upon which the jury may rest a finding convicting of manslaughter, speculation of what may have happened, of which there was no evidence, ought not to be authorized. The distinction between murder and manslaughter is that in the latter there is an absence of malice, while to constitute murder there must have been malice aforethought. Because of the absence of this element of murder, manslaughter is regarded as a distinct crime, not a mere degree of the higher offense, though included therein, and the jury should convict of manslaughter only where there is reasonable doubt as to which the accused is guilty of. *State v. Clemons,* 51 Iowa, 274; *State v. White,* 45 Iowa, 325. On the killing of a human being, when this is done by the use of a dangerous weapon calculated to produce death, the presumption, in the absence of any explanation to the contrary, is that such taking of life was with malice aforethought. Chief Justice Shaw well expressed the rule in the course of his charge to the jury in *Commonwealth*

3. SAME: manslaughter: when not an included offense.

v. *Webster*, 5 Cush. (Mass.) 295 (52 Am. Dec. 711), in saying that:

Where the fact of killing is proved by satisfactory evidence, and there are no circumstances disclosed tending to show justification or excuse, there is nothing to rebut the natural presumption of malice. This rule is founded on the plain and obvious principle that a person must be presumed to intend to do that which he voluntarily and wilfully does in fact do, and that he must intend all the natural, probable, and usual consequences of his own acts. Therefore, when one person assails another violently, with a dangerous weapon, likely to kill, and which does in fact destroy the life of the party assailed, the natural presumption is that he intended death or other great bodily harm; and as there can be no presumption of any proper motive or legal excuse for such a cruel act, the consequence follows that, in the absence of all proof to the contrary, there is nothing to rebut the presumption of malice.

The record is void of any evidence, circumstantial or otherwise, even tending to indicate that the killing of Charles Barrett was otherwise than intended and premeditated, and a verdict of manslaughter would have been the arbitrary exercise of the power to commute the punishment of a crime actually committed, and impose a punishment different than that prescribed by law. Such a verdict would have been a flagrant disregard of all the proof, and a violation of the obligation of the jury to return a true verdict. Though there is some conflict in the decisions, this court is committed to the doctrine that it is not error to omit to submit whether the accused is guilty of manslaughter when there is no testimony tending to reduce the offense, if any there was, below the grade of murder. *State v. Cater*, 100 Iowa, 501. The principle involved was approved in *State v. Murphy*, 109 Iowa, 116, wherein a prosecution for assault to commit murder, we held there to have been no error in not permitting the jury to say whether the accused was guilty of assault with in-

tent to commit manslaughter. The rule has ample support elsewhere. *Sparf v. U. S.,* 156 U. S. 51 (15 Sup. Ct. 273, 39 L. Ed. 343); *Davis v. U. S.,* 165 U. S. 373 (17 Sup. Ct. 360, 41 L. Ed. 750); *State v. Nelson,* 91 Minn. 143 (97 N. W. 652). The accused was accorded an impartial trial, and the evidence justified his conviction. *Affirmed.*

WEAVER, J. (dissenting).—I dissent from the argument employed and conclusion reached in the second paragraph of the foregoing opinion. I am also of the opinion that the court erred in failing to instruct the jury upon the included offense of manslaughter.