STATE OF IOWA, appellee, v. ROBERT ALFRED FISCHER, appellant.

No. 48161.

(Reported in 60 N.W.2d 105)

SEPTEMBER 22, 1953.

REHEARING DENIED NOVEMBER 20, 1953.

Doran, Doran, Doran & Erbe, of Boone, and Lund & Lund, of Webster City, for appellant.

Leo A. Hoegh, Attorney General, Raphael R. R. Dvorak, Assistant Attorney General, Lawrence R. Kayser, County Attorney, and Lloyd Karr, of Webster City, for appellee.

THOMPSON, J.—Defendant was accused by county attorney's information, filed April 24, 1951, of murdering Alfred Warren Fischer, contrary to section 690.1 of the 1950 Code of Iowa. He entered his plea of not guilty to this charge. On February 4, 1952, the information was amended so it accused defendant of the crime of "murder in the second degree, in that he did murder the said decedent; at said time and place with malice aforethought." Defendant then entered his plea of not guilty by reason of temporary insanity and/or lapse of memory. Upon trial to a jury the defendant was found guilty of murder of the second degree. Judgment was entered accordingly; and his motion for

new trial having been denied, he was sentenced to confinement in the state penitentiary at Fort Madison for a period of ten years. From this judgment and sentence he appeals.

Alfred Warren Fischer, the decedent, was the father of the defendant. He was, and had been since 1944, the superintendent of schools at the town of Jewell. He was well known in high school circles throughout the state, not only as an educator but even better, perhaps, as an official in football and basketball contests. The defendant was born September 15, 1936, so at the time of the alleged killing, April 18, 1951, he was about fourteen and one-half years of age.

That the decedent came to his death through gunshot wounds inflicted by the defendant with a .22 caliber rifle cannot be seriously disputed. On the early evening of the date in question the decedent had required defendant to assist in raking leaves in the yard of the family home in Jewell. Mr. Fischer became dissatisfied with the manner defendant was performing his task and sent him to his room, saying, according to defendant, "I'll take care of you later" or words of similar import. Defendant went to his room, and shortly thereafter his father came to the room, where the shooting took place. The rifle used was kept by defendant in his room. It was a .22 caliber gun with a magazine which held perhaps twenty bullets. The magazine was filled by defendant after he reached his room. Decedent's body was pierced by eight separate shots, and while two or three of the wounds were superficial it is evident that at least three or four of them would have been certainly or probably fatal. Ten empty shells were found on the floor of the room.

I. While thirteen errors are assigned as grounds for reversal, the only one argued, with brief points and authorities submitted, is No. 3: "In submitting second-degree murder, because there was no competent evidence from which malice could be inferred." The same point is perhaps touched upon in other assignments, particularly No. 5.

We find this assignment without merit. Malice is of course an essential element of the crime of murder. But we have many times said assault with a deadly weapon implies malice; and if death ensues the presumption is warranted that such kill-

ing was with malice aforethought, unless there be an explanation to the contrary showing a legal excuse for the assault and killing. Thus, a showing of self-defense might remove the presumption of malice. But ordinarily, and certainly under the facts in this case, the question whether a legal justification is shown is for the jury. We said in State v. Brown, 152 Iowa 427, 437, 132 N.W. 862, 866: "On the killing of a human being, when this is done by the use of a dangerous weapon calculated to produce death, the presumption, in the absence of any explanation to the contrary,. is that such taking of life was with malice aforethought." In State v. Hayden, 131 Iowa 1, 8, 107 N.W. 929, 931, we said: "The rule almost everywhere is that from the mere fact of killing the inference of malice arises; * * * ." See also State v. Teale, 154 Iowa 677, 684, 135 N.W. 408, State v. Roan, 122 Iowa 136, 97 N.W. 997, and many other cases cited in State v. Hayden, supra.

We have examined the cases cited by defendant in support of his contention at this point. Each of them holds, under the facts shown in the record, there was not sufficient evidence of malice to warrant the submission of murder in the second degree. Patently, however, each depends upon its own facts, and a sufficient showing of malice to require a jury determination may appear in one case although absent in another. The cited cases do not aid defendant.

There is other evidence than the use of a deadly weapon by the defendant from which the jury could have found malice. Shortly after the killing the defendant made a written statement, or confession, to the sheriff, county attorney, and coroner, telling of the occurrence and of his motives for shooting his father. This confession was admitted in evidence, and rightly so—the jury being correctly instructed as to its competency. In the confession the defendant said:

"The only explanation of why I did what I did is that I was angry." Apparently he was anticipating paternal punishment. He further says: "As he (his father, the decedent) opened the door, I shot him, but I don't know where I hit him. I shot several times and he went back into the hall. He called to my mother 'Mommy, I'm shot.' He came back into the room and I shot him

several more times. I had the rifle to my shoulder each time I shot. He kind of staggered over to the bed and grabbed a board (from the bed) and started for me, and I shot him again, and then he hit me with the board, and I fell on the bed and he fell on the floor, with the board underneath him."

■ The defendant told a quite different story on the witness stand. His version then was that he shot twice as his father first came into the room to warn him, shooting low and to one side, without intent to hit him; that his father then retreated into the hall, calling to Mrs. Fischer that he was shot; then he came back into the room, tore the bed apart to secure a board from it, and struck the defendant across the shoulders, knocking him down. What happened after that he testified he does not remember. But we are concerned here with the State's evidence. If it generates a jury question on the issue of malice, it is not important that it be denied or contradicted by the defense, unless and except in the rare instances when such denial or defense is so complete and conclusive as to destroy the State's showing. We do not have such a situation here. The assault with a rifle, certainly a deadly weapon, the number of shots fired, the statements in the confession, which the jury had a right to believe, all made a jury issue on malice. At other points in his testimony the defendant said he was "mad" at his father. The court properly submitted the offense of murder in the second degree to the jury.

■ II. One of the assignments of error complains of Instruction No. 18. The assignment is argued only very briefly and no brief point notes any authority in support of it. The only reference to the point in argument is contained in these two sentences: "State's *requested* instruction No. 18 is not an approved instruction under the factual situation here. It was not proper and is not a correct statement of the law." Assuming defendant's complaint is against the instruction actually given, we set it out herewith:

"You are further instructed that the father of a minor child has the right to administer punishment for the correction of such child; that it is the duty of such child to submit to said punishment; that in the administration of said punishment the father has the right to enter a room occupied by such child and that

such child has no right to resist such punishment unless the amount of force used or the means employed by the father render such punishment abusive rather than corrective in character."

Under the familiar rule that all instructions must be read together and considered as a whole, we also quote the somewhat lengthy Instruction No. 17, dealing with self-defense, which we think must be read with Instruction No. 18.

"In connection with the third and fourth elements of the defense of self-defense, you are instructed that where a person is assaulted or threatened with an assault in such manner and under such circumstances as to cause him to honestly believe as an ordinarily prudent and cautious person that he is at the time in actual danger of losing his life or of suffering great bodily harm, then and in that case he is justified in using such force and such means to protect his life and person as may in good faith then have appeared necessary to him as an ordinarily prudent and cautious person. He is not required to make nice calculations as to just how much force he may be required to use in order to shield himself from danger. All that is required of him is that he shall act from reasonable and honest convictions as to his danger although mistaken as to the extent of such danger.

"If you find from the evidence in this case that the defendant had been assaulted or threatened with an assault by the deceased and that from all of the facts and circumstances then existing the defendant had reason as an ordinarily prudent and cautious person to believe and did in good faith and honestly believe that he was in danger of being killed by or of suffering great bodily harm from the deceased, then and in that case the defendant was justified in using such force and such means to protect his life and person as may in good faith then have appeared necessary to him as an ordinarily prudent and cautious person under all the circumstances then surrounding him, even to the taking of life, and if you further find that the defendant did not use greater force or more hazardous means to protect his life and person, if you find that he did so, than honestly appeared to him to be necessary as an ordinarily prudent and cautious person under the circumstances in which he was then placed, then

and in that case the defendant would be entitled to claim that he had acted in lawful self-defense in so far as the third and fourth elements are concerned, even though what he did caused the death of deceased.

"As you have heretofore been told, the burden is upon the State to prove by the evidence beyond a reasonable doubt that the defendant in doing what he did, if you find that he did anything, did not act in lawful self-defense. If after considering all of the evidence in the case you find that the State has done so, then the defense of self-defense as that term has been defined to you in these instructions is not available to the defendant; but if the State has failed so to do and there is a reasonable doubt in your minds on this question you should find the defendant not guilty."

Instructions Nos. 14, 15, 16, and 17, immediately preceding 18, dealt with the defense of self-defense. Instruction No. 18 was clearly intended to be a qualification of No. 17. They must be considered together. Had not the relation of parent and child existed the decedent would not have been justified in assaulting the defendant, and under the circumstances detailed in Instruction No. 17 defendant could have protected himself by the use of the necessary force. But this relation did, exist and it was proper, required in fact, that the jury be told of the right of parental punishment and the extent to which the father might go in administering it. Instructions Nos. 17 and 18 gave the jury parts of the same picture and must necessarily be considered together.

It remains to consider whether Instruction No. 18 properly stated the law concerning the right and duty of a parent to administer punishment. This right has its limitations. The modern trend is to restrict the degree and extent of the chastisement a parent may inflict. But the right still exists, in moderation and for the purpose of correction and training. The doctrine "to spare the rod is to spoil the child" has been thought by some to be now outmoded. On the other hand there is a growing current of opinion that lack of parental oversight and discipline is responsible for much of the juvenile delinquency now so apparent and so dangerous to our society. Proper discipline, including corporal punishment when needed, within reason and for the

purpose of correcting the child and so promoting his training and welfare, is the serious duty of every parent. And, also within the bounds of moderation and for the purpose of the best interest of the child, the parent is entitled to be the judge of what is required and the means to be adopted. This does not mean that he may punish with undue severity or cruelty, or only because he is angered with the child and thereby gratifies his own aroused passions.

It seems to be the position of the defendant, gathered from his exception to Instruction No. 18 rather than from his brief and argument, that the court should have used the word "reasonable" preceding "punishment" in each place where it appears in the instruction; and that the instruction as a whole does not define the rights of the child, but only of the father. We have already called attention to Instruction No. 17 which told the jury of the right of the child to protect himself in self-defense. As to the word "reasonable", it is undoubtedly a proper qualification of the parent's right to administer punishment. But we think when the court told the jury that "such child has no right to resist such punishment unless the amount of force used or the means employed by the father render such punishment abusive rather than corrective in character", the proper test was given. The punishment could not be "abusive"; it must be "corrective."

This court has laid down the rule to be applied in Rowe v. Rugg, 117 Iowa 606, 607, 608, 91 N.W. 903, 94 Am. St. Rep. 318, thus:

"It is the general rule that those having the care, custody, and control of minor children may, for the purpose of proper discipline and control, administer such moderate and reasonable chastisement as shall effect the desired object, and this rule has been applied generally to all those occupying a position in *loco parentis*. The law continually looks to the future of the child, as well as to its present condition; and it is its policy, in dealing with the various questions which are constantly arising affecting its care and custody, to determine the line of action that shall best subserve its present and future welfare. The duties which the parent owes to the child as well as to the public, in the matter of its maintenance, protection, and education, have generally

been held to give the parent or other person occupying such relation the power to thus discipline and correct it."

To the same effect is this from 39 Am. Jur., Parent and Child, section 13, page 601: "A parent, being charged with the training and education of his child, has the right to exercise such control and restraint and to adopt such disciplinary measures for the child as will enable him to discharge his parental duty. This includes the right to chastise refractory and disobedient children. But at the same time, the law, in its regard for the safety of the child, has prescribed bounds beyond which parental discipline shall not be carried. In chastising a child, the parent must be careful that he does not exceed the bounds of moderation, and inflict cruel and merciless punishment; if he does, the law will refuse any longer to recognize his parental privilege."

The same question is discussed and substantially the same conclusion reached in People v. Green, 155 Mich. 524, 119 N.W. 1087, 21 L.R.A., N. S., 216; State v. Koonse, 123 Mo. App. 655, 101 S.W. 139; Boyd v. State, 88 Ala. 169, 7 So. 268, 16 Am. St. Rep. 31; Hinkle v. State, 127 Ind. 490, 26 N.E. 777; State v. Shaw, 64 S. C. 566, 43 S.E. 14, 60 L. R. A. 801, 92 Am. St. Rep. 817; and Clasen v. Pruhs, 69 Neb. 278, 95 N.W. 640, 5 Ann. Cas. 112. See also 67 C.J.S., Parent and Child, pages 630, 631, section 7.

It is our opinion that telling the jury the punishment must not be abusive but must be corrective is the fair equivalent of saying it must be "reasonable" or "moderate." If it was abusive it would not be reasonable or moderate. That it must be corrective means it must be for the purpose of correction rather than to satisfy the enraged passions of the parent.

There was evidence adduced by the defendant from which the jury might have found the decedent was a harsh and unreasoning parent, given to unduly severe punishments. There was also evidence justifying the conclusion the defendant was a wilful and disobedient child, given at times to evasion of reasonable parental orders, at others to undue slowness in obeying them. It was for the jury rather than this court to say where lay the truth. Of course both the State and defendant were entitled to have the questions presented submitted under proper instruc-

tions, which fairly stated the law of the case. We think this was done.

III. In lieu of presenting brief points and argument in support of his other assignments of error, the defendant tells us lack of adequate finances has prevented him from so doing. He invites us at this point to go over the record as he thinks we are required to do under section 793.18, Code of 1950, which we herewith quote: "If the appeal is taken by the defendant, the supreme court must examine the record, without regard to technical errors or defects which do not affect the substantial rights of the parties, and render such judgment on the record as the law demands; it may affirm, reverse, or modify the judgment, or render such judgment as the district court should have done, or order a new trial, or reduce the punishment, but cannot increase it."

Whether we are required to do this when the defendant is represented by counsel and files a formal brief and argument we do not decide. We suggest such procedure would in many cases be unfair to the State, which of course answers only the contentions raised by the defendant's assigned errors which are argued. In any event, we have in this case searched the record as presented to us and find no prejudicial error.—Affirmed.

HAYS, C. J., and OLIVER, GARFIELD, WENNERSTRUM, SMITH, and MULRONEY, JJ., concur.

BLISS, J., dissents.

LARSON, J., takes no part.